Shaw, C. J.
The ease which this court are now called upon to decide, affecting the rights and interests, and depending on the rules and usages, of the large and respectable denomination of Christians, known as Quakers, is regarded by the parties and their respective friends and adherents, as one of great importance to the well-being of the society. This importance does not so much depend on the amount of property involved in this particular case, as upon the principles on which it must be decided, and the extent to which these may affect the rights of others interested in the same questions.
This is a suit in equity brought by the plaintiffs, describing themselves, and claiming title to the property described, as overseers of the Swanzey monthly meeting of the people called Quakers. They set out a deed, more particularly stated hereafter, made by Elizabeth S. Danforth in August, 1821, to Jonathan Chace, Benjamin Slade, and Reuben Chace, all described in the bill as since deceased, and the bill is brought against many persons named, as the heirs at law of the said grantees, and also against William Wood, Palmer Chace, Miller Chace, Seneca Lincoln, Philip Tripp and William Slade, who allege themselves to be the overseers of Swanzey monthly meeting, the plaintiff* averring and charging, that *433 the said Wood and others are not the true overseers of Swanzey monthly meeting; that their claim is a groundless pretence, and that the plaintiffs are the true overseers.
The subject of the controversy is a tract of land, situated in the town of Fall River, (formerly Troy), with a meeting-house standing thereon.
The object of the bill is to ask this court, as a court of equity, to declare a trust respecting said lot and meetinghouse, that the same is held by those of the defendants, described as heirs of Chace and others, the original grantees, in trust for the use, benefit and accommodation of the Swanzey monthly meeting, and to order them to make and execute conveyances accordingly in execution of such trust; to declare and decree that said William Wood and others, the other defendants in the bill, are not the true, legitimate and authorized overseers of said Swanzey monthly meeting, but that the said Earle and others, the plaintiffs, are the true, legitimate and authorized overseers of the Swanzey monthly meeting, entitled to all the privileges of that character; that as such they are now clothed, by the laws of this commonwealth, with corporate powers, to enable them to take and hold real estate, to them and their successors, as a corporation; and their object is to obtain a decree, declaring a trust in their favor, vesting the legal estate in said lot and meeting-house in them and their successors, and requiring the defendants to convey the same to them accordingly.
The defendants, William Wood and others, by their answer, deny that the plaintiffs are the true and legitimate overseers of said Swanzey monthly meeting, but on the contrary they allege that they themselves are such true and legitimate overseers, and that either by force of a deed of Thomas Wilbur annexed to their answer, they are already seized of the said estate in fee, in their corporate capacity, to hold to them and their successors, for the use of said monthly meeting; or, if the fee and legal estate in the premises still remain in the heirs of the original grantees, the other defendants in this bill, then they admit, that said estate is held by such heirs, in trust for Swanzey monthly meeting; but they aver, that *434 they are the true and authorized overseers of said Swanzey monthly meeting, and they insist that said trusts ought to be declared in their favor, and the legal estate to be conveyed and released to them accordingly, in execution of the said trust.
This bill was filed in April, 1845, and an answer was put in. Subsequently, in October of the same year, a supplemental bill was filed by the plaintiffs, which, after reciting fully the substance of their former bill, proceeds to state, that after the filing of the former bill, to wit in June, 1845, the yearly meeting of Friends for New England was convened at Newport, in the state of Rhode Island, pursuant to the usages and discipline of that body; that being so assembled and duly organized, they proceeded to consider the conduct and doings of the Swanzey monthly meeting, and also of the Rhode Island quarterly meeting, of which. Swanzey monthly meeting was a component part, and the proceedings of said quarterly meeting ; and that the said regular yearly meeting, upon a review of all the proceedings in relation to the regularity of the respective bodies, each claiming to be the true monthly meeting, declared the body, of which David Shove was clerk, and by whom the plaintiffs were chosen overseers, to be the time Swanzey monthly meeting; and that the body, of which Thomas Wilbur was clerk, and by whom the defendants were chosen overseers,'was not the true and legitimate Swanzey monthly meeting. It further alleges that the said yearly meeting confirmed and established the doings of said Swanzey monthly meeting, of which David Shove was clerk, and of the Rhode Island quarterly meeting, of which Buffum was clerk, and directed the conveyance of the estate in controversy to be made to the plaintiffs as such true and legitimate overseers.
The defendants put in an answer to the supplemental bill, protesting that the court has no jurisdiction, and that the plaintiffs have an adequate remedy at law; they nevertheless answer, setting forth in extenso and reiterating their former answer; they annex the original deed from Elizabeth S. Dan-forth to Chace and others, also a deed given subsequently, on *435 the 26th of August, 1844, and purporting to be a deed of Thomas Wilbur, as clerk of Swanzey monthly meeting, to themselves as overseers, in trust to hold the same for said monthly meeting; they deny that the heirs of Chace and others, the original grantees, have any estate or interest, legal or equitable, in the premises, and that the court has any jurisdiction to compel those heirs to convey; and aver that Thomas Wilbur was and is clerk of said meeting, that he entered into the trusts in said deed mentioned, and conveyed the same to these defendants; and they now claim to hold the same, not only by virtue of the deed of said clerk, but as a body corporate, authorized by the statutes of the commonwealth to hold in succession all grants and donations of real or personal estate to said meeting. They admit that certain proceedings were had, after the filing of the former bill, before a body of Friends calling themselves and their meeting the yearly meeting for New England; but they deny that the proceedings are correctly set forth in the bill, and deny that their title can be affected by such subsequent proceedings, and pray that the supplemental bill may be dismissed.
They then proceed, after reaffirming their former answer, to set forth that the society of Friends are duly organized under a regular form of government and rules, setting out then organization into preparative, monthly, quarterly, and yearly meetings, accountable and subordinate; that the monthly meetings annually choose overseers, who hold their offices until others are chosen or appointed; that the yearly meeting appointed a meeting for sufferings, to take cognizance of any grievances in the intervals between yearly meetings, and to counsel and assist, as best wisdom may direct; they state how quarterly and yearly meetings are composed, and set forth their peculiar mode of deciding deliberative questions, not by a majority, but by the solid sense of the meeting, to be collected, declared and minuted by the clerk, who is the presiding member; they set forth at large the usual mode of proceeding, and proceed to allege that the defendants are the true overseers, and that the plaintiffs have no claim or color to be overseers, except by the choice of a schism, and of separatists; and they set forth *436 the proceedings of the monthly meeting of which Thomas Wilbur was clerk, and the quarterly meeting of which Wilbur was clerk and Perry assistant, as true meetings, in unity with the yearly meeting; they deny that'the said Swanzey monthly meeting is shown not to be in unity with, but disowned by the yearly meeting for New England. But they further answer, that they do not admit the proceedings set forth in the supplemental bill to be the proceedings of the true, legitimate and legal yearly meeting, but that they were proceedings of separatists from said meeting; and aver that the proceedings of the true meetings, monthly, quarterly and yearly, are those set forth in true copies of minutes annexed. They admit a want of love and unity in the society, and attribute it to a difference of religious tenets and doctrinal sentiments, and aver that the plaintiffs and .those whom they represent have adopted unsound doctrines, advocated by Gurney, and are called Gurneyites, whilst they and their friends, adhering to the original principles and sound doctrines of the society, are called Orthodox Friends. They set forth what the true doctrines are, how they are in effect changed by the writings and doings of Gurney, and that the Gurneyites have taken unfair and unwarrantable means to get their own friends and partisans into all places of influence, and to obtain an ascendency in the control of the society; that at the yearly meeting they have departed from the usage and discipline of the society, in postponing the nomination of a clerk; that the orthodox representatives, as in duty bound, proceeded to agree upon clerks, and reported the same, which being fully united with by the sound Friends, they were accordingly appointed, and the usual business was gone through with; and they set forth the proceedings, and thereupon conclude that the Gurneyite party were the separatists. Finally, they insist that the Gurneyites, under whom the plaintiffs claim, are separatists from the society of Friends, do not agree in the belief of the fundamental doctrines of the society, and are opposed to its order and discipline, and especially that the monthly meeting, of which David Shove pretends to be the clerk, are separatists, and have seceded from the true Swanzey monthly meeting, *437 of which Thomas Wilbur was clerk, and have no legal existence, and have no right to hold the said lot, or to choose or appoint overseers for that purpose; but contrarywise, claim that they are the true overseers, and entitled to hold the said estate.
Both parties rely upon the deed of Mrs. Danforth as the ground work of their respective claims of title, whether legal or equitable.
This deed is an extraordinary document, upon which it is extremely difficult to put any satisfactory construction, according to the rules of law applicable to conveyances. The direct and palpable object was, to sell a lot of land to the society of Friends to build a meeting house upon, and give them the entire and perpetual use and disposition of the land. But how this was to be accomplished according to the rules of law, how and in whom the legal title was to be placed, and how it was intended that the title should be continued and perpetuated, it is extremely difficult to ascertain or even conjecture, from the terms and provisions of this deed.
It may be proper and useful to state in the outset, that at the time when this deed was executed, there was no enactment in the laws of Massachusetts, providing a method by which the Quakers, as a religious community, could take and hold real estate in succession. It was stated and assumed in the argument, that such a power is provided by our law; but it was not stated, I believe, that this power is of comparatively modern origin, and did not exist in 1821. Such a power had been granted to certain officers of other religious bodies not incorporated, such as the deacons of congregational churches, for the use of their churches; the wardens and vestry of episcopal churches, for the use of their several churches, by the provincial act of 28 Geo. 2, passed in 1754. This was reenacted by St. 1785, c. 51, and embodied, and its powers extended, by Rev. Sts. c. 20, § 39. But as we understand it, this power was first extended to the society of Friends, constituting the overseers of each monthly meeting a corporation, or vesting those who may be overseers for the time being, with corporate powers, to take and hold estate in succession, *438 by St. 1822, c. 92, passed on the 11th of Februaiy, 1823* The Quakers never formed into parishes, or regularly incorporated religious societies, for the support and maintenance of public worship, and therefore, being mere aggregate bodies of individuals, until the above act was passed vesting their overseers of monthly meetings with qualified corporate powers, there was no mode in which real estate could be appropriated and set apart for their use, except by trust deeds, in which the estate might be vested, as at common law, in certain persons and their heirs, in trust to permit the society to have the entire possession and enjoyment of such estate. Up to a comparatively recent period, there was no court of equity in this commonwealth, competent to take cognizance of such a trust and enforce it; but probably the conscientious sense of duty, on the part of trustees, would have afforded sufficient security to the beneficiaries, for the enjoyment of their rights.
In recurring to Mrs. Danforth’s deed, it seems to us, that it was very inartificially drawn.† It recites that the considera *439 tion, a pecuniary one of $225, was paid by Chace, Slade and Chace, for and in behalf of the monthly meeting; it grants the *440 premises to four persons, namely, George Shove and the same three before mentioned, and their heirs and assigns; and in the habendum, and the residue of the deed, neither is Shove’s name mentioned, nor does he execute with the other three, to give effect to the declarations of trust contained in it. After the granting part to them and their assigns, the deed adds, “ to and for the uses, intents and purposes of the people called Quakers, forever, as set forth for the more effectual government thereof, in the covenanting clause by the said grantees, as hereafter, expressed,” habendum to said Chace, Slade and Chace, “ as feoffees, in trust for the said people, their heirs and assigns forever.” It will not be necessary to recite the residue of this deed, so familiar to all parties concerned, in order to render intelligible the comments we propose to make on it.
It does not appear by the deed, that the grantees, by themselves, or with Shove, were the overseers of any monthly meeting, or even that they were Quakers, unless this is to be inferred from the subsequent mention of their being in unity. *441 But if they were overseers of any monthly meeting, the deed did not profess to convey the estate to them in their corporate capacity; if it had, and there had been any law in force, authorizing them to take in their corporate capacity, the estate would have immediately vested in them, as such corporation, and there would be no occasion to resort to the principle of a shifting use. The deed seems to have been to them and their heirs, in fee, and as they were capable as individuals of taking and holding in that capacity, to them and their heirs, it is manifest that the entire estate in fee passed from Mrs. Danforth the grantor. Then how did the legal estate vest ? Independently of the statute of uses, it would undoubtedly vest in Chace, Slade and Chace, and their heirs, in fee simple. But it seems extremely difficult to regard this as a conveyance to uses, within the statute which transmutes the use into possession and gives a seizin. It was in terms, “ to and for the uses, intents and purposes of the people called Quakers.” Treating the whole instrument as the act of the grantor and grantees, it is difficult to consider it as a conveyance, intended to have any other effect than to vest the fee in the grantees, in trust for the Friends, as a body. We are now considering the question as to the vesting of the legal estate, and it is necessary to keep in mind the plain distinction between the legal estate and the beneficial interest. There was no person in being, named as cestui que use, capable of taking seizin of real estate; of course the estate could not vest in any such person. The overseers had not then corporate powers, enabling them to take seizin; the unincorporated aggregate body could not be cestui que use, because it had no capacity to take. Nobody is named as entitled to the use and benefit, capable of taking under the statute. Treating the latter part of the deed, (that which purports to be the act of the grantees only,) if it is proposed to bring it under the operation of the statute as a covenant to stand seized, the difficulties seem insuperable ; there is no good consideration in kindred or affinity for such covenant, no covenantee, and no definite designation of any legal use. If the clause be relied on, which provides, that if the grantees or their heirs shall be declared out of unity, *442 and they shall not be capable of executing this trust, or stand seized thereof, but the clerks respectively may enter and .hold, &c., this is simply void as contrary to the rules of law. It is not a defeasance upon a condition subsequent, on the happening of some contingency, which defeats the whole estate, and authorizes the grantor to enter and revest in himself his former estate; but it is an attempt, by a limitation over, after an estate in fee granted by deed, upon the happening of a contingency, to divest the estate and grant it over, which cannot be done. But it seems hardly necessary to pursue these technical inquiries further, upon the effect of this deed upon the legal estate, because it is conceded, or it must be conceded, that if any clerk could enter and hold, it must be the true clerk, and if Thomas Wilbur was the true clerk, and took any estate in the premises or any power to convey, and did convey any estate to .the defendants, it was after the statute, and must have been a conveyance to them and their successors, overseers &c., in their corporate capacity, and they could only hold as long as. they continued to be the true and legitimate overseers; and if they ceased to be so, and another body of officers came to be the true overseers, the latter were successors, with a right to take and hold the estate by force of the statute. In one respect, perhaps, this question might be material; if the question were between the two sets of overseers, upon the mere legal title, this court would have no jurisdiction as a court of equity. It seems, therefore, proper to add, that it does not appear that the original grantees or their heirs have ever been declared out of unity, and therefore it does not appear that that contingency ever happened.
There is also another contingency stated, on which it may be the right of the clerk by the terms of the deed to enter, and that is, “ when any of us or our heirs succeeding us in this trust shall depart this life.” All the remarks made upon the contingency of being declared out of unity, defeating the estate, and limiting it over, would apply still more strongly to this. If this should be construed literally, that is, that in case any one of the grantees should depart this life, the whole estate should go over, then no heir could ever take, and this is *443 directly repugnant to the whole grant, habendum, and covenants, which limit the estate to them and their heirs. The only sound construction is, “ when the first grantees and all their heirs die.” This would be to limit an estate in fee over, after decease of all heirs; and it is void by the rules of law. But if it would have been valid, the contingency has not yet happened. On the whole, the court are of opinion, that by this deed the estate vested in the grantees in fee personally and at their decease went to their heirs; that Wilbur, the clerk, had no authority to enter; that he took no seizin by that entry; that he conveyed none by his deed to William Wood and others; and that the legal estate remains vested in the heirs of the original grantees.
But in another aspect it appears to us, that the deed in question has all the qualities and characteristic features of a regular deed of trust, by which it was intended to vest the fee in the grantees, as feoffees in trust, the legal estate to be held by them and their heirs (or the heirs of the survivor) for the benefit and accommodation of an aggregate body of individuals, not a corporation, but recognized by law as a religious body, associated for the purposes of maintaining public worship, and other purposes incident thereto; and upon the further trust, to transfer and convey the fee, upon due notice and request, to the appointees of the Swanzey Monthly Meeting of Friends. Let us examine the deed briefly in this view.
Whether an instrument shall operate as a transfer vesting an estate, or as creating a trust cognizable by a court of equity, does not depend much upon the employment of the terms “ use ” and “ trust; ” but rather upon the object, purpose and construction of the whole instrument. Were it otherwise, however, the words “ use ” and “ trust ” are both so freely used in this deed, and so indiscriminately, that they would afford little aid in determining the construction and effect of the conveyance.
After stating the consideration as paid by Chace, Slade and Chace, for and in behalf of the monthly meeting of the people called Quakers, known by the name of Swanzej Monthly Meeting, the grantor proceeds to give, grant, bargain and sell, *444 to ihem, their heirs and assigns, to and for the uses, intents, and purposes of the people called Quakers, for ever, as set forth in other parts of the instrument, the lot of land in question. The habendum to them and their heirs designates them as feoffees in trust. The covenant of warranty is to and with them and their hens and assigns, as well as to the said people (i. e. called Quakers.) As a covenant of warranty, this last clause is purely void; “ said people ” are not parties, were not incorporated, had no capacity to take ; the grant was not to them, and the covenant could only be coextensive with the grant. The residue of the instrument is rather the act, declaration and stipulation of the grantees, explanatory of the character and relation in which they take the grant and consent to hold it, and connected with the grant only by a reference to it in the granting part. As a clear and distinct declaration of trust, under the hands and seals of the grantees, simultaneous with the grant, it is above all exception, and would be so if it were a separate instrument. They acknowledge and declare, that they take and hold the premises in trust, and that they are to take no right to the premises to their own use; and for the more effectual and full performance of said trust, they stipulate that they and their heirs, at the cost and request of said monthly meeting, or such other meeting as the said people of Swanzey for the time being shall belong to, being in unity with the yearly meeting for New England, will do such further act as may be advised, &c. As a covenant for further assurance this is bad, because there is no covenantee; but as a declaration that they hold it in trust for the appointees of a Friends’ meeting, and in trust to make a good and valid legal conveyance to such appointees on due notice, it appears to be legal and valid. The residue of the instrument, declaring that if the grantees or then heirs should be declared out of unity, or should die, the clerks might enter and convey or hold as feoffees; and also the clause of release and quitclaim to such clerks upon such contingency, we think are void as affecting the legal estate, for reasons already given. The clause of release and quitclaim cannot have any legal effect, for the reasons already stated, and further, because it is an attempt to create an estate in fee, to *445 commence in futuro, upon a contingency, and in persons not ascertained. As bearing upon the point, that the grantees were not to hold the estate for their own, but for the use and benefit of the society of 'Friends, which may be accomplished by treating it as a conveyance in trust, but cannot by treating it as a use, this part of'the instrument is in harmony with all the other parts, and with its general tenor.
It appears to us that this construction is conformable to the intention of the parties, so far as the intention manifested by the deed can be carried into effect by the rules of law; and if the instrument discloses an intention to create an estate contrary to the rules of law, such an intention can have no influence in determining its construction.
And we think such a trust, for the use of a well known religious community, is valid, and may be carried into effect, although the cestuis que trust and beneficiaries are a voluntary association of individuals, designated only by a general name and description. All gifts and grants in trust, for the support of public worship and religious instruction, or for the advancement of piety, morality, and useful education, are valid as charitable trusts, and will be carried into effect by this court as a court of equity. Nor is it material whether the large equitable jurisdiction of chancery, over charitable trusts, is founded on St. 43 Eliz. c. 4, or has a deeper and more ancient root in the common law. The St. of 43 Eliz. c. 4, was passed before our ancestors came to this country, and was regarded here as part of the common law upon which their institutions were founded. Commonwealth, v. Leach, 1 Mass. 59.. It has frequently been recognized as the law of the land in this commonwealth ; for which I will cite a very few of the existing cases. Bartlet v. King, 12 Mass. 537; Trustees of Phillips Academy v. King, 12 Mass. 546; Going v. Emery, 16 Pick. 107; Tucker v. Seaman's Aid Society, 7 Met. 188. The provisions of the St. 43 Eliz. are amply sufficient to give effect to and render valid this conveyance, as a gift in trust for charitable uses.
When the ease of Bartlet v. King was decided, it was considered that it was no objection to the operation of St. 43 *446 Eliz. that there was then no court vested with a jurisdiction in equity to carry such a trust into effect. An equitable jurisdiction over trusts for certain charitable uses had been early conferred on the county courts under the colonial government. Anc. Chart. 52; Hadley v. Hopkins Academy, 14 Pick. 240. But this jurisdiction was not renewed under the provincial government. Acts were passed soon after the adoption of the provincial charter, in 1692 and 1693, for establishing a high court of chancery for the province. Anc. Chart. 222, 274. It is believed that these acts were not carried into effect, having been disapproved and negatived by the king. But in 1818, an act was passed (St. 1817, c. 86) vesting this court with full equity jurisdiction, in all cases of trust, under which trusts for charity have been considered as fully embraced. This act was in force when the conveyance in question was made, and this circumstance may have had its influence in leading the parties to adopt the course they did, with a view to the accomplishment of these purposes, through the instrumentality of a common trust deed, to be carried into effect by a court of equity, although they may have had some intention to accomplish it by means which the law holds impracticable.
The court are therefore of opinion, that the instrument in question did constitute a good and valid conveyance to the original grantees, as trustees for a charitable use, proper to be sustained and carried into execution; that the legal estate vested in the heirs at law, subject to such trust; and that this court, as a court of equity, has cognizance of the subject-matter of this suit, and to hear and decide between the parties.
Before passing from this subject of the legal estate, I intended to say a few words upon the question, whether this instrument, as a conveyance to these persons and their heirs, to hold in trust, constituted them joint tenants or tenants in common. If the former, then the rule of survivorship would take effect, and the estate vest in the heirs of the survivor. If the latter, .the heirs of all the grantees would take by inheritance. In framing conveyances in trust to two or more *447 grantees, the .most usual course is to use words creating a joint tenancy; because, as the main object of creating and continuing the legal estate is to support and feed the trust, the more concentrated it is, the more effectually it accomplishes that purpose; here no such precaution was taken, and the question must depend on the rules of law. By the rules of the common law, this conveyance to three persons and their heirs by deed would constitute a joint tenancy, but this rule has long since been altered and modified by statute, and the question is, what the extent of such modification is.
By the Rev. Sts. c. 59, § 10, “ all conveyances and devises of lands, made to two or more persons, except as provided in the following section, shall be construed to create estates in common, and not in joint tenancy; unless it shall be expressed therein that the grantees or devisees shall take the lands jointly, as joint tenants, or in joint tenancy, or to them and the survivor of them.” Section 11 provides, that “ the preceding section shall not apply to mortgages, nor to devises or conveyances made in trust,” &c. Had this law been in force, when the deed in question was made, it would have been decisive; but it was not. It did not go into operation till May, 1836. We are then to go back to the law which was in force in 1821, which was St. 1785, c. 62, § 4, by which, after a preamble stating some reasons for it, this authoritative construction should be given to grants or devises to two or more persons, constituting them estates in common and not in joint tenancy. The act has no special exception of conveyances in trust, but the exceptions are thus stated: Unless it is
stated that the grantees or devises shall hold jointly, &c., or unless other words be therein used, clearly and manifestly showing it to be the intention of the parties that such lands should be held as joint estates, and not as estates in common. When the manifest purpose of the conveyance, as apparent in the whole tenor of the deed, would be best promoted by construing it a joint tenancy, and defeated or impaired by a contrary construction, it has been held under this exception, that the words manifested an intent to create a joint tenancy; as in case of a grant to husband and wife; *448 Shaw v. Hearsey, 5 Mass. 521; or a mortgage to partners to secure a joint debt; Appleton v. Boyd, 7 Mass. 131; Goodwin v. Richardson, 11 Mass. 469. In these cases, such a construction was almost necessary to give effect to the conveyance, and therefore the intention was presumed. In case of a trust, such construction, though convenient, and after-wards introduced by statute, could hardly be regarded as necessary, and therefore we cannot say that the words used did plainly and manifestly show an intention to create a joint tenancy. We are therefore of opinion that the grantees took an estate in common, which descended to all their heirs.
This is probably a question of very little practical importance ; all the defendants, summoned as heirs of the grantees, have suffered the bill to be taken as confessed, and have probably no objection to' any decree which may be made on the subject. Whether the fee is in the heirs of one or all the grantees is immaterial, except for the sake of regularity.
Supposing the deed of Elizabeth S. Danforth to be a good valid deed and conveyance in trust, the next question is, who are the beneficiaries or cestuis que trust, competent to claim the performance of the trusts. There being a valid grant of the legal estate to Chace, Slade and Chace, and their heirs, creating a good legal estate in fee to support a trust, who can claim it under the provisions of this deed ? It being for the uses of a religious body, to support public worship and religious instruction, and thus a recognized charity, it is no objection to it that the persons to be benefited are uncertain, not definitely designated, that they are an unincorporated, voluntary association of individuals. Bartlet v. King, 12 Mass. 537; Going v. Emery, 16 Pick. 107; Burr v. Smith, 7 Verm. 241; Vidal v. Girard, 2 How. 128. Many other authorities might be cited, but the last is directly in point, embraces a full discussion of the subject and a review of the authorities, and is itself a decision of the highest authority.
At the time when Mrs. Danforth’s deed was executed, there *449 was no law in force giving to the overseers of monthly meetings, or to any other persons holding any office or appointment in the Quaker community, a corporate character or capacity to take and hold property in succession; the persons, therefore, designated in said deed as beneficiaries were unincorporated individuals. According to the rule above stated, however, this circumstance is no valid objection to the conveyance, or to the constitution of such trust, if, in point of fact, the persons thus designated can be ascertained.
When, therefore, property is conveyed or devised to one person by name, as the treasurer of a voluntary society, in trust for such society, the legal estate vests in the treasurer, in his natural capacity, to hold in trust, and the beneficiaries or cestuis que trust will be ascertained by any competent evidence, proving association and organization under a particular form, the choice of officers, the keeping of minutes, the issuing of reports, the annunciation of its objects, and the like. Tucker v. Seaman's Aid Society, 7 Met. 188.
The conveyance thus made by the Danforth deed, being to persons capable of taking and holding real estate, in trust for persons not capable, the question is, upon the terms of the deed, who these latter persons were. We think it is plain that they were the persons constituting the Swanzey Monthly Meeting of the people called Quakers. It was suggested in the course of the argument, that the trust was general, and not for any particular class of Quakers, and perhaps some single clauses would give color to such an argument. But, taking the whole deed together, and construing it in reference to Quaker usages, we think it was for a class or community of Quakers, living within a certain local and defined territory, and designated as Swanzey Monthly Meeting. The consideration was paid, for and in behalf of the people so designated, and, though the habendum was in trust for the people called Quakers for ever, and in the covenanting clauses it is declared to be in trust “for said people,” the stipulation is, that at the cost and charge of said meeting, to execute such further deed, &c. By the evidence relative to the constitution and usages of the Society of Friends, a monthly meet- *450 L is a local division and designation, and embraces all those wnj reside within such local limits. We are of opinion, therefore, that the trusts in this deed, although in two or three places they may seem to be for Friends generally, yet, construed as a whole, were for those Friends residing within the local .units of Swanzey Monthly Meeting, as then constituted. It is hardly necessary to refer to the exception in the deed, namely, that the trust is to convey to such persons, as the Swanzey Monthly Meeting, or such other monthly meeting, as said people at Swanzey for the time being shall or may belong to, being in unity with the yearly meeting for New England, shall appoint, &c. This refers to a fact not contested, which is, that by the constitution and usages of the Society of Friends, it is competent for the quarterly or yearly meeting, within their- respective limits, to fix and alter the limits of monthly meetings, and to set up and lay down monthly meetings, and in the latter case to annex the people of the meeting laid down to another monthly meeting; and the clause recited looked to that contingency, and adapted the trust accordingly, giving the beneficial interest to the same people, though annexed to another monthly meeting. But as it is not suggested that the Swanzey Monthly Meeting has ever been laid down, or the limits of its territory changed, the contingency affecting the trust has not happened, and the trust remains as if no such change had been provided for.
We are then to consider the effect of the statute, passed soon after this conveyance. St. 1822, c. 92, already cited. It was undoubtedly intended to put the Society of Friends on the same footing with congregational churches and other ecclesiastical bodies not incorporated, but voluntarily associated together, for the purpose of spiritual edification and mutual discipline, and for the celebration of religious rites and ordinances. The policy of these laws was, not to incorporate the whole body of voluntary associates, as in cases of territorial or poll parishes; but to invest some known and designated officers and functionaries, chosen and set apart according to the constitution and usages of such respective bodies, with corporate powers to take and hold property in succession, in *451 trust for the unincorporated association, often fluctuating and varying in numbers and members. Such had been previously done in respect to the larger and more numerous ecclesiastical bodies, constituting the deacons of congregational churches, and the wardens and vestry of episcopal churches, corporations for this purpose. The legislature were undoubtedly well informed of the constitution of the Society of Friends — that all belonged for the time being to some monthly meeting, and such monthly meeting had officers, called overseers, charged with the care and arrangement of their secular affairs; it was therefore enacted, that the overseers of each monthly meeting of the denomination of the people called Quakers should be deemed so far a body corporate, as to take and hold in succession all grants, &c. made or to be made to such meetings, to said overseers, or to the use of any such meetings, or the poor thereof, to alien or manage, &c., and in the name of said overseers for the time being to prosecute, &c. These provisions are substantially reenacted in Rev. Sts. c. 20, § 46.
By the statute" of 1822, the rights and powers of the overseers of Swanzey Monthly Meeting, with all others, were defined and enlarged. Before, they had a right in equity, as cestuis que trust to require an execution of the trust, by permitting them, and the monthly meeting of which they were overseers, to use, occupy and enjoy, in undisturbed possession, the lot in question, with the buildings erected upon it. After the statute, they had a right to a conveyance of the legal estate, and when conveyed to hold it to them and their successors in office in perpetuity, for the use and benefit of their monthly meeting.
The effect of thus clothing officers, chosen annually or otherwise, for the time being, with corporate powers, is, by force of law, and for useful and beneficial ends, to give to persons holding certain offices, though in fact frequently changing, the character of perpetuity and unbroken continuance, which is the peculiar characteristic of a corporation, and is well illustrated by the ancient principles applied to a corporation sole. Weston v. Hunt, 2 Mass. 500.
The same rule applies when, by statute, like corporate *452 powers are invested in several officers, periodically elected, who are to take in succession, as the wardens and vestry of an episcopal church; Montague v. Smith, 13 Mass. 405 ; the deacons of a congregational church; Stebbins v. Jennings, 10 Pick. 172, and Page v. Crosby, 24 Pick. 211; or town officers; Overseers of Poor of Boston v. Sears, 22 Pick. 122.
The theory of law is, not that churches, towns, or other aggregate bodies, corporate or unincorporate, choose persons to be a corporation; but, being chosen to offices recognized by law or usage, such as deacons, wardens and vestry, overseers, and the like, the law takes effect, and proprio vigore annexes the corporate capacity to the office, and no act of transfer is necessary to transmit the property, when once vested, from the incumbent to his successor. It follows, as a necessary consequence, that however frequently the incumbents are changed, the property changes as frequently, so that, in contemplation of law, it always remains in the incumbent for the time being.
Assuming, then, as from the foregoing view of the law we think it must be assumed, that the overseers of the Swanzey Monthly Meeting of the people called Quakers are entitled by right to demand and require a conveyance to them of the estate in question, we are brought to the question, whether Oliver Earle and his associates, the plaintiffs, constitute that board of overseers; or whether William Wood and his associates, part of the defendants, hold that relation, and entitle themselves to the conveyance. For the convenience of designating them, I shall call them simply plaintiffs and defendants.
From the view of the law, which has thus been taken, it is entirely manifest that there can be but one regular, legitimate and legal monthly meeting, and but one authorized set of overseers. It is a question of property; the nature of property consists mainly in the right of control and the power of disposing of any estate, real or personal. There cannot be two adverse owners of the same thing at the same time; the disposing power and dominion of one proprietor is conclusive *453 against the same in any other. However plausible, therefore, may be the grounds of claim of title on each side, however minute the line of distinction between them, and how great the difficulty of discovering it, we know there is such a a line, and it must govern in deciding the question; and pro- ' nouncing in fa vor of one, is necessarily pronouncing against the other.
Again; the law which gives corporate powers to certain officers or functionaries, whether of corporations, voluntary associations, or religious bodies or communities, assumes that the existence and identity of such bodies or associations, and the due and proper election or appointment of the officers and persons so designated may be proved by competent evidence, adapted to the nature of the subject. Where there is no legal incorporation, the constitution, organization and proceedings of such bodies may be proved like other facts, by articles of association formally adopted or generally assented to, and by the usages of the body. In the case of congregational churches, the identity of the church is ascertained and identified by that of the incorporated parish in which it is gathered; and the authority of deacons to take in a corporate capacity, by proof of their election, accoraing to usage. And so in the episcopal, and all other incorporated religious societies. Where the right is claimed by officers of a religious society not incorporated, the right may be proved by the fact of association, and the election of such officers, according to the rules and usages of such associations; to be proved, like other facts, by documents and by testimony. This is eminently true of the society of Friends, who, it is believed, neither in then smaller or local divisions, or in their larger character as a denomination of Christians, have ever been constituted corporations by law. Nothing can be clearer, however, than that there is such a community of Christians as Quakers; they are numerous and respectable; they have had so prominent a place in New England, and they are marked with so many peculiarities, that their existence is easily proved. But in regard to their action and mode of proceeding, so far as the right of property is concerned, there is an intrinsic difficulty, *454 which must have been seen and felt throughout this lamentable controversy and this elaborate litigation. This arises from the peculiar mode of acting and deciding in aggregate bodies, not by a numerical or any other fixed majority of votes, given by those authorized and qualified to give a voice upon any question; but upon the solid sense of the aggregate body, having regard to age, character, judgment, piety, and numbers combined, to be gathered and ascertained by the clerk, who is uniformly the presiding officer. However well calculated this may be to promote the great spiritual objects of the society, to secure harmony, unity of feeling, and religious peace, it is little calculated to afford a practical rule of action, and stand as certain proof, where there is any actual conflict of opinion, and where, from any cause, controversy actually arises. In a numerous body of all ages and capacities, there must be much uncertainty, where the utmost honesty and impartiality prevails. But clerks must be human beings, and although in theory aided and assisted by an overshadowing power and wisdom greater than their own, yet it may be darkened and obscured by human predilections. If there be any strong party feeling upon a theological controverted question or any other, the clerk will be something more than human if he do not participate in it. As a presiding officer he has a voice; his own judgment is to be put in the scale with others in ascertaining the solid sense of the meeting; and though he is honest and sincere, and earnestly desires to be guided by best wisdom, there is danger that he may be unconsciously influenced by it to allow too much weight to the predilections of his friends, and somewhat too little to that of his opponents. But the testimony, it is believed, is uniform on both sides, that this is the only mode in which the doings of aggregate bodies of Quakers, in monthly, quarterly and yearly meetings, as well as those of committees and select bodies from them, are conducted, and the results of them ascertained.
But the legislature have declared, that overseers of monthly meetings of Quakers, for the time being, shall be corporations, and take and hold property in succession; it assumes, therefore, that such overseers may be appointed or chosen, and *455 may be superseded by others, and of course that these facts, like all other facts upon which rights of property depend, are capable of judicial proof by competent and appropriate evidence ; of course it is the proper province of courts of justice, in order to the adjustment of such rights, to investigate and ascertain these facts, by the best evidence which the nature of the case affords, whether entirely satisfactory or otherwise.
Before coming directly to the evidence, it seems necessary to inquire what is the true test or standard to decide which is the true monthly meeting and who are the true overseers.
Several things are conceded, or so proved, as not to admit of doubt. Regarding the society of Friends as a religious body and an ecclesiastical organization, there is a very regular order and system of action, management and government, and a regular subordination of the inferior to the superior. They are divided into preparative, monthly, quarterly and yearly meetings. The preparative meetings, it is believed, are designed mainly to facilitate the attendance on meetings for worship, within the limits of a large monthly meeting. But the main business, disciplinary and administrative, is done in monthly meetings. Each monthly meeting is subordinate to a quarterly meeting, composed of several monthly meetings, and the monthly and quarterly meetings are subordinate to the yearly meeting for New England, which includes the whole territory of New England, excepting Vermont and that part of Massachusetts west of Connecticut river. . Each yearly meeting is independent of all others, and different yearly meetings have no other connexion than that which results from Christian fellowship and courtesy.
It is also admitted that the rules of discipline, as altered and amended from time to time, are referred to the committee of sufferings by the yearly meeting for New England, reported to and approved and adopted by them, and are of high and unquestionable authority, throughout the limits of this yearly meeting. The committee of sufferings is actually a committee of the yearly meeting, having a general supervising and advisory jurisdiction in the intervals of yearly meetings, and occa *456 sionally charged with special additional duties. The different yearly meetings in America and England keep up a friendly and fraternal communication with each other, by means of epistles, visits and liberating certificates, or general letters of recommendation, from one to another; but there is no subordination acknowledged of any one to another, or to all the others.
From this view of the constitution, organization and acknowledged usages of the Quaker body, it appears that the yearly meeting has a final and controlling jurisdiction in all matters of faith and religious duty, of administration and discipline, as well as of manners and conduct, of all Quakers within its limits. It is final and conclusive, because there is no superior body which can call its decisions in question. It is conclusive, in the sense in which the judgments of the highest court are conclusive, not because they are necessarily wiser or better than those of other courts, but because it is the tribunal of last resort, and the constitution and laws have created no tribunal to reexamine its decisions.
We have already stated, that the plaintiffs and the defendants each claim to be the overseers of Swanzey monthly meeting, and demand a conveyance of the property. If the difficulty rested here, it would probably be very easily, and would long since have been settled by the quarterly meeting, or in case of dissatisfaction there, by the yearly meeting, to which both, in the ordinary course of proceeding in the society of Friends, would acknowledge subjection. But this protracted controversy, and the voluminous mass of evidence taken in it, discloses the unhappy fact, that there are two conflicting bodies, each claiming to be the regular Rhode Island quarterly meeting, to which Swanzey monthly meeting belongs, with its regular officers, and also two distinct and conflicting bodies, each claiming to be the true and legitimate yearly meeting for New England, duly organized and conducted according to the discipline and usages of the society. Each therefore claims to be approved, sanctioned and confirmed by the superior meetings, to which its own is admitted to owe subordination.
*457 We are thus necessarily driven to the inquiry, which of these conflicting organizations are the true and legitimate successors, or to speak more accurately, which of the two yearly meetings for New England, the two Rhode Island quarterly meetings, and the two Swanzey monthly meetings, are the actual, identical and real yearly, quarterly and monthly meetings of the society of Friends of those respective designations, and have continued so in one unbroken line, from a period anterior to this controversy, to the time of the commencement of this suit. The one must be so; when this is shown, it will also be shown that the other is not so. By what test shall this question of identity and continuity be determined ?
At one stage of this controversy, it seemed to be supposed that it would depend mainly upon soundness of faith, an adherence to or dissent from speculative theological opinions and belief, and much evidence was taken upon that subject, and it was alluded to, in the learned arguments addressed to us.
It would seem to be inconsistent with the nature and principles of the Quaker system, as far as it is disclosed in the case before us, to be bound down, as a body, as a Christian denomination, to a precise and unbending rule in matters of speculative opinion. They profess to believe in the continued influence and presence of the Holy Spirit to the mind of each individual, humbly waiting for its manifestation to aid in the discovery of divine truth. It would seem, therefore, that they must suppose it possible, that new truths may be discovered and so manifested as to require the assent of the true disciple, and thus add something to his existing faith. It is also true, as we understand, that they profess to believe that the scriptures are given by inspiration, and are the unerring guide to Christian truth; and that if any man supposes that he has an inward light, contrary or repugnant to the truth of the scriptures, it cannot be a true light. But perhaps there is no inconsistency in believing that the scriptures of the old and new testaments are a true and unerring guide to divine truth, yet that all the truths of scripture have not been *458 made manifest to the imperfect mind of man, and in the language of Father Robinson, of Leyden, that “ more truth is yet to break forth from the holy scriptures.” Should such be the fact; should the testimony of the scriptures and the influences of the Holy Spirit concur in bringing to the conviction of humble, sincere and inquiring minds, the knowledge of further Christian truths, manifested with a brilliancy and clearness not to be mistaken; it seems perfectly consistent with the avowed principles of the society of Friends, to adopt and sanction them, although they were not known to Pennington, Barclay, Fox and the respected founders of their society, and under a full belief that if the same light had been thrown on the same truths in their day, these sincere and seeking men would have humbly and devoutly embraced them.
We would not be supposed by this, to intimate that the Quakers have no creed, no theological tenets, to which they are strongly attached, and no superintending watchfulness over the soundness of the faith of their members and subordinate meetings, or that they allow any great latitude of discussion to then members on theological subjects. On the contrary, the discipline expressly prohibits the publication of all writings relating to then religious principles or testimonies, unless first laid before the meeting for sufferings, for their advice and concurrence, and their approval of them obtained.
What we mean to say is this; that if after solid and weighty consideration, humbly and conscientiously awaiting the guide of best wisdom, the yearly meeting should fully unite, in the proper as well as the Quaker sense of that term, in adopting some modification of their creed, or of then speculative opinions, adhering to their great principles of love and fraternal duty, it would, upon their 'professed principles, seem too much to say, that they would thereby cease to be Quakers, and cease to be the society of Friends. Especially we think, this could not be asserted by meetings and individuals subordinate to them, who owe, ecclesiastically, allegiance to them, and to whom, so long as they remain subordinate, the decisions are final and infallible, as well in matters of faith as of conduct. All disaffected members, having full liberty of con *459 science, might undoubtedly dissent from such opinions, and adopt different tenets; perhaps they might, by so doing,become better theologians, better Christians, and better men; but they would cease to be Friends in unity with such yearly meeting, and with the meetings and individuals subordinate to it. Such dissenting individuals might form themselves into yearly, quarterly and monthly meetings, but this would be a new organization, and not the identical body to which they had been formerly attached.
We should be unwilling to say, that there may not be a departure from the fundamental principles on which the society is founded, on the part of the yearly meeting, the responsible head and representative of the whole body, in fact the society itself, so deep and radical, as to destroy its identity with the society of Friends, who had been invested by law with the enjoyment of property and civil rights. But if such a case be possible, it would seem to be a suicidal destruction of the body itself, leaving its property derelict. If heresy should infect individuals only, however numerous, they might be disowned and cut off, and the body remain sound, but if the ultimate and infallible judge of what is essential to Quakerism judges wrong, who, in pursuance of any of the forms or principles or discipline of Quakerism, shall declare the heresy or pronounce the disownment ? But it is not necessary to pursue such a remotely possible supposition ; we have barely alluded to it, by way of protest against the conclusion, that no departure from Christian truth and the principles of Quakerism, can be so great as to work a dissolution of the society.
But we are saved the necessity of going further into this supposed test from creeds and opinions. The unhappy controversy indeed rose out of a jealousy or apprehension, on the part of some of the Quaker body, that" another part were covertly circulating and endeavoring to promote false doctrines in the society; but we have no evidence, that any organized meeting, monthly, quarterly or yearly, took any step as a body to promote or establish any opinion or tenet of belief, not entirely correct. The charge on the part of *460 John Wilbur and his friends was, that the friends of the present plaintiffs, in the monthly meeting of the party with whom they were cooperating in the quarterly and yearly meetings; were endeavoring to advance and promote the works and tenets of Joseph John Gurney; which however they denied. The charge was made against the quarterly meeting of which Buffum was clerk, and the yearly meeting of which Abraham Shearman, Jr., was clerk. It is now conceded, that at the last-mentioned yearly meeting, in 1845, a narrative and declaration was put forth, in which they avow and state their belief, in a manner admitted to be in conformity with the ancient testimonies of Friends,' and satisfactory to those who affix the imputation of heresy to that same yearly meeting. This is said to be an eleventh hour repentance; made to avoid the mischievous and dangerous consequences of what they had already done. But we see nothing penitential in it, no acknowledged change of belief or conduct, but a declaration of what then were and ever had been the doctrines and tenets held by them.
Nor do we see any evidence, that any other or different opinions had been advanced. The argument strongly urged is that the opinions of Gurney were unsound, and that the friends of Gurney had endeavored covertly and by insidious means to gain a predominance in the Quaker body, and that they had in fact gained an ascendancy in the quarterly and yearly meetings. This is an imputation of wrong motives and purposes in individuals. No proof appears to establish the truth of such imputation upon individuals, or if such motives did exist, that they have ever induced any meeting to adopt any measure for the promulgation of false doctrines or unsound opinions.
We are then brought to test this question, by that which upon full consideration we consider the correct and proper standard, to wit, whether Oliver Earle and his associates the plaintiffs, or William Wood and his associates the defendants, were the true rightfully appointed overseers of Swanzey monthly meeting, according to the discipline, acknowleged to be the constitution and to embody the fundamental laws of *461 the society of Friends, expounded by the general usages of those persons of most experience and judgment, who have acted under it, and acknowledged its authority.
The precise question in issue here is, whether the plaintiffs at the time this suit was brought, in April, 1845, were entitled in equity to a conveyance of the estate granted by Elizabeth S. Danforth. If they were overseers, duly appointed according to the system of ecclesiastical polity, acknowledged by the society of Friends, they were the officers contemplated and designated by the statute, as overseers of the monthly meeting. Words and terms in an act of legislation, relating to a class of persons, including all religious sects and denominations, must be expounded and applied, according to the sense and meaning in which they are known to be used in such class or denomination. The terms, “ ministers,” “ deacons,” “ wardens,” “ vestry,” and the like, when used in statutes as designating “ officers,” must be held to apply to persons thus designated in the church or community to which the statute relates, and to persons appointed or set apart to hold those offices, according to its constitution and usages.
The legislature, in providing means for holding property in succession for the use of Quakers, and designating overseers of monthly meetings for that purpose, must have intended overseers appointed or set apart in an orderly manner, according to the fundamental rules and usages of Quakers. Ti e plaintiffs then must show, in order to entitle them as a corporation to a conveyance of this property, that they were overseers so constituted and so by force of the statute were de facto a corporation, competent to take and hold the property. We must therefore inquire and judge, by this standard, of the correctness and regularity of the proceedings by which each party claim to be a corporation by force of the statute; yet it is proper to remark, that this is an issue collateral and incidental to the direct issue before us, which is that of equitable title. It follows therefore, that although we must inquire and decide judicially, by their rules, upon the regularity of these proceedings, it is not with a view of affirming them, or setting them aside, but simply because it is incidental to *462 the question of title, which we must decide. We have no power to decide judicially, and directly affirm or annul the acts of individuals, or of monthly, quarterly or yearly meet, ings, which are brought before us in the case, but simply to ascertain facts, on which the real issue before us depends.
One further remark it seems proper to make before going to the evidence. This suit was brought in April, 1845. Subsequently, in June, 1845, the yearly meeting at Newport took place, at which proceedings wore had having a bearing on this case. By a supplemental bill, filed by the plaintiffs after-wards, in October, 1845, the proceedings of this meeting were set forth. The supplemental bill was answered under protest, and much evidence was taken on it. It was objected, however, that these proceedings having occured after the suit brought, the court could not take notice of them.
If this objection does not come too late, upon which we express no opinion, we think it is not well founded. I shall not pause at present to give the authorities on which this opinion is based, but simply to say, that although the doings of the yearly meeting, in June, 1845, have a bearing, and an important bearing, upon the question, still that question is, whether the plaintiffs had a title in April, 1845. They now claim no title which originated in the proceedings of the yearly meeting, or is founded on them. The bearing they have is to show, by relation back, whether the plaintiffs or the defendants held that relation of overseers of Swanzey monthly meeting, to which the law annexed the powers of the corporation competent.to require a conveyance of the Danforth estate.
1. The first direct question of fact upon the evidence relates to the doings of Swanzey monthly meetings in July and August, 1844.
There had been a growing dissatisfaction for some time in that monthly meeting, of which Thomas Wilbur had long been clerk; a committee had been appointed long previously, according to usage, to report the name of a suitable person for clerk, but had been unable to agree ; the disorderly condition of that monthly meeting- had attracted the attention of the *463 quarterly and yearly meetings, or that of the committee of sufferings, and Friends from them attended to advise and assist. At the meeting in July, the business was opened by Thomas Wilbur; in the course of it David Shove was nominated, not by any committee, as his opponents say, irregularly; others testify, that his appointment was united with by the meeting; but this is denied, and it appears that it was not declared by the clerk, nor did he relinquish his seat. At the August meeting there was a fuller attendance' of Friends from the quarterly and yearly meetings, and one of the controverted questions is, how far, according to discipline, they could act in advising, influencing or directing the proceedings. Before the meeting was opened by the clerk, Meader requested a pause, and made a statement of the doings of the previous meeting, and proposed that the meeting should unite in the appointment of David Shove, which one side testify was fully done, which the other party deny. Thomas Wilbur did not relinquish his seat, but persisted in acting as clerk, and considerable disorder ensued.
Taking the peculiar manner in which the sense of meetings is ascertained, it is very questionable whether the proposed nomination at the July meeting, by three out of a committee of seven, nominating David Shove as clerk, was regular; and as the sense of the meeting in its favor was not declared and minuted by the then acknowledged clerk, it can hardly be maintained by other evidence that he was chosen. But the meeting in August was attended by a committee of the quarterly meeting and other Friends; at this meeting David Shove, at the opening, whether regularly or irregularly, was declared, and proceeded to act as clerk, till the adjournment was announced; but Wilbur still claimed to act, and when the meeting was declared adjourned, he and his friends refused to recognize the adjournment, but continued, and after Shove and his friends had retired, proceeded to organize, choose a clerk and assistant, and overseers and representatives to the quarterly meeting, and adjourned. The meeting, of which Shove claimed to be clerk, also chose clerk, overseers, and representatives. Earle and his associates were chosen *464 overseers by the latter; Wood and his associates were chosen overseers by the former. The actual division took place here.
Without recapitulating the evidence, which is very voluminous, we should be inclined to the opinion, that at the August meeting Shove must be taken to be the authorized clerk; that those who remained after the adjournment was announced, and elected Wilbur clerk, and Wood and others overseers, acted irregularly, and became seceders; and if Shove had been improperly elected, they should have sought their remedy by an appeal to the quarterly meeting, and ultimately, if need be, to the yearly meeting But if the case depended solely or mainly on this point, we should go into a more minute and thorough examination of the evidence, as to the exclusive authority of the clerk for the time being to propose every question; and especially as to the right and power of committees of the quarterly and yearly meetings and other Friends, to attend, advise, and act at monthly meetings.
2. The next inquiry is, concerning the regularity and proceedings of the Rhode Island quarterly meeting, of which Buffum was clerk, held in November, 1844.
The Rhode Island quarterly meeting was the ecclesiastical superior, to which the Swanzey monthly meeting was subor- ' inate and owed submission and obedience. In this respect, the society of Friends are similar to religious communities acting under a hierarchy, or regular church government, as the catholic, episcopal, presbyterian, and Dutch Reformed churches. We are so accustomed to the independence and absolute freedom of each church, as recognized by Congregationalism, that we may not duly appreciate the obligation of obedience to ecclesiastical authority. Men are not bound to be Quakers; but if they would be Quakers, and brethren in unity with each other and with their common superiors, they must conform to their rules and judgments.
As the facts in regard to the Rhode Island quarterly meeting, in November, 1844, are scarcely controverted, we may as well take the statement from the testimony of Thomas Wilbur. It is conceded that, at the opening of this quarterly meeting, *465 David Buffum was clerk, as he had been several years; the meeting, therefore, was opened, and proceeded regularly to business. Of course it must so continue till the organization was changed, by the appointment of another clerk. Accounts were presented and representatives approved, as well from the body claiming to be the monthly meeting, of which David Shove was clerk, as from that of which Thomas Wilbur was clerk. The term " accounts ” is used technically, and is understood to be a written return of the monthly meeting, authenticated by its clerk, to the quarterly, stating answers to certain standing queries, respecting its condition, notice of any business to which the attention of the superior is asked by the inferior, and also the names of the representatives chosen to attend and form the quarterly meeting. The accounts sent by the meeting, of which Shove was clerk, were received, and the representatives from that meeting recognized; those from the meeting of which Wilbur was clerk were not. The account of the former was read and adopted, as emanating from the genuine monthly meeting, and at the same time the quarterly meeting appointed a few persons to have the care of that monthly meeting for a time. The witness then goes on to state, that as David Buffum did not appear disposed to transact the regular and legitimate business of the quarterly meeting, it was proposed to appoint another clerk in his place, but it was not done until David Buffum and his party had accomplished their business and left the house, when the representatives retired to another part of the house, to report suitable persons, &c., who returned and proposed Thomas Wilbur for clerk of Rhode Island quarterly meeting, and Charles Perry for assistant clerk, who were united with by those present, and they proceeded to do the business of the meeting. It appears by a minute of the proceedings of this meeting, that the representatives of no other monthly meeting voted in it, except those appointed by the Swanzey monthly meeting, of which Thomas Wilbur was clerk. These minutes contain a special report, drawn up by a committee to be entered on their minutes, in which they seek to palliate and justify their proceedings, on the ground of un *466 due influence and oppression on the part of those who have assumed to be ruling members in the quarterly meeting, and who have also supported a certain writer or writers of doctrines at variance with the long established principles of the society; they defend themselves and testify against the course and proceedings of those ruling members of Rhode Island Quarterly Meeting, for the reason that they have separated themselves and departed from the order of the society.
It appears to us clear, from the evidence, that this attempt to set up another Rhode Island quarterly meeting, under Wilbur, as the true meeting, was wholly null and void. The quarterly meeting opened and proceeded under Buffum, until it was closed by adjournment; during this time, a proposal was made by some one, it is not stated by whom, certainly not by the clerk Buffum, or by any committee; but it is conceded that it was not adopted. This meeting, thus constituted in regular form under Buffum, did act upon the subject of deciding which was the true Swanzey monthly meeting. Both accounts were before it; the representatives of both were present; those of the Wilbur meeting urged the admission of their claims; but the account signed by David Shove was read and adopted, as emanating from the genuine monthly meeting. Both could not be received; one was entitled to be received; a decision between them must be made, and the adoption of the one was necessarily the rejection of the other.
We think it manifest, from the evidence, that this attempt on the part of the representatives of Swanzey monthly meeting, after the regular quarterly meeting had closed, to set up another quarterly meeting, was wholly unwarranted, contrary to discipline and to usage; that they themselves considered it irregular, and a proceeding which required an apology; but the apology, for the reasons given, fails, and cannot justify them in separating and setting up another meeting with the character of a regular quarterly meeting. The reasons might satisfy their own consciences in separating; but in doing so they put themselves out of unity, and ceased to be Quakers, or Friends in unity.
For these reasons the court are of opinion, that the ques *467 tion, which of the monthly meetings was the true one, was within the jurisdiction of the regular quarterly meeting, of which Buffum was clerk; that it was directly before them ; that they decided it; and that that decision must stand, until reversed or modified by the yearly meeting.
3. We are then brought to the consideration of the doings of the yearly meeting for New England, held at Newport, in June, 1845. For reasons already given, we think these proceedings are rightly before us, because they relate back and affect the question, who were the true overseers of Swanzey monthly meeting when the suit was brought. The yearly meeting is recognized as the tribunal of last resort; its decisions of all matters within its jurisdiction are conclusive, and all true Friends are bound by them.
But here again we are met with the difficulty that there are two bodies, each claiming to be the true yearly meeting; whilst it is clear that one only can justly have that character, and exercise this unquestionable controlling power. Nor is it safe to decide this question upon minutes and records alone, because each has its clerk and minutes, which may appear fair and regular; but the jurisdiction must be decided by the evidence. It is not necessary to consider this evidence minutely. It is clear, that when the meeting met at Newport, Abraham Shearman, Jr. was the acknowledged clerk; on Monday, the first day for business, he opened the meeting, and the business proceeded in due order. But there were two accounts, and two sets of representatives from Rhode Island Quarterly Meeting, and the question was, which should be received, and this required, immediate consideration. It was provided by the discipline, and had been the usage of the yearly meeting, after the forenoon adjournment of the first session of the meeting for business, for the representatives of all the quarterly meetings to assemble and agree on the nomination of a suitable. person for clerk, to be reported to the yearly meeting in the afternoon. On account of this difficulty, of there being two sets of representatives from one quarterly meeting, the yearly meeting, before the adjournment, agreed to refer the question, which was the true body of repre *468 sentatives, to the representatives of all the other quarterly meetings, and that the appointment of a clerk should be postponed, instead of being made at the afternoon session of the same day. The representatives from the Wilbur meeting declined to appear and submit their case to the other representatives, as a committee, and in the afternoon, when the yearly meeting again assembled, Prince Gardner proposed that Thomas B. Gould should be clerk, and said that some of the representatives had met, according to discipline, and nominated him. A very large number of all the other representatives denied that any such nomination had been made; yet, as some united in the appointment of Gould, he was declared elected, but not by the clerk.
It appears to us very clear, upon the evidence, that though this action was made the occasion of holding a separate meeting under Gould, yet that, as a legitimate yearly meeting, it was altogether irregular and void. Gould’s own minute seems quite conclusive. Giving an account of this meeting after a long recital of grievances, oppression, heresy and misconduct, on the part of leading men, he states that it was regularly formed under Shearman as clerk; that the question, as to which set were the true representatives, was referred to the other representatives, and states the reasons why those coming from the Wilbur meeting declined so to submit the question, and proceeds to state, that in the afternoon, Prince Gardner, on behalf of the representatives from Rhode Island quarterly meeting, and some of those from Sandwich quarterly meeting, reported that they had been together, and were united in proposing the name of Thomas B. Gould for clerk of this meeting for the ensuing year, and of Charles Perry for assistant clerk; and the nominations being fully united with, by those who have been for some years laboring under much oppression, for the support of the order and discipline and of the testimonies and doctrines of our religious society upon their original foundation, they were accordingly appointed.
This was the basis of the secession, and of an attempt to organize a separate yearly meeting. The only apology for *469 offering such a nomination by Gardner at that time, after the meeting had agreed to postpone the appointment of clerk till after the decision of the other question, was, that the discipline so required it. But the discipline was the act of the yearly meeting, prescribing a convenient general rule, adapted to ordinary occasions; but the power, which could make, could modify or suspend this rule, and had done so. The clerk, declared to be chosen, in his minutes does not venture to assert that his nomination was united with by the meeting, but only by those who had been oppressed.
The only reason assigned, by way of justification or apology, is, that they and their friends had been oppressed. Whether this justification could have availed, had such oppression been proved to be done or sanctioned by the yearly meeting, would present a very different question. But at this time the yearly meeting had done no act, refused no application for redress, declared ho heretical opinion, nor taken any step to be complained of.
The argument is, that they were bound to choose a clerk on the first day. Suppose it to be so, and that they failed of duty in that respect, does that dissolve the society, or warrant a small minority, against the declared sense of a great proportion of all the members present, to do an act which can only be done in pursuance of the solid sense of the whole body, taken, declared, and minuted by its only acknowledged regular officer 1
On the evidence, the court are of opinion, that the yearly meeting, attempted to be formed under Gould, was not, and scarcely professed to be, formed according to discipline; but that they separated to avoid the rightful authority and controlling action of the yearly, meeting, to which they were subordinate; and although they professed to do this for what they deemed to be good cause, yet they thereby became separatists, and ceased to be in unity with the society of Friends: but that the yearly meeting, of which Shearman was clerk, was rightly formed and conducted as the yearly meeting for New England, and that they had done no act to forfeit their *470 rights and claims to the supremacy belonging to them by the discipline and fundamental laws of the society.
4. Supposing, then, that the yearly meeting of which Shearman was clerk was duly constituted as the yearly meeting for New England, the court are of opinion that they had jurisdiction of this question, and that they acted and decided definitely on the subject. The question was directly before them, which were the true representatives; and this depended on the question, which were the true monthly and quarterly meetings; they considered it necessary to settle this, before proceeding to the principal business of the meeting, in order to give the legitimate representatives of Rhode Island quarterly meeting their just voice and weight in its proceedings. The reception of one set, as true and legitimate, was the rejection of the other.
Was this question fairly decided? According to discipline, all Friends at a yearly meeting act in its deliberations and doings; but there are seven or eight representatives, deputed from each quarterly meeting to the yearly meeting. This question was referred to all the representatives, except the two contesting sets. They were a select body, apparently impartial; they gave notice to both parties of the time for hearing them; afterwards made their report to the yearly meeting, and gave notice to those to whom the report was adverse, that it was to be taken up and acted on; they declined to attend; and, after solid consideration, it was adopted and entered on the minutes of the yearly meeting. At the same meeting, a narrative was put forth, as the official and authoritative judgment of the meeting, adopted by them, and ordered to be authenticated as their act, in which the plaintiffs are recognized and declared to be the rightful overseers of Swanzey monthly meeting, appointed in August, 1844.
We have already alluded to the objection, that the jurisdiction of the yearly meeting of June, 1845, was superseded or suspended by the pendency of this suit, by which the jurisdiction was transferred to this court. We see no weight in this objection. The jurisdictions are over different questions, and exercised diverso intuitu. The one determines a rule of *471 order and regularity of discipline: the other, a question of property and equitable right. The one acts directly upon the , doings of a subordinate body, and approves or reverses them; the other inquires into then regularity, to ascertain and declare the rights dependent on them.
It was intimated in the argument, that the rights of the monthly meeting could not, by the discipline, be drawn in question before the yearly or quarterly meeting, without a complaint of misconduct, notice, and an opportunity to answer. But there was no question here, as to the rights of the Swanzey monthly meeting; but as to the claims of certain individuals to be the rightful overseers, representatives and officers of the Swanzey monthly meeting.
On the whole case, the court are of opinion, that the plaintiffs are entitled to a decree for the establishment of their title to the land and meeting-house, as prayed for in their bill

 This statute is as follows: “ An act, in addition to ‘ an act for the better securing and rendering more effectual grants and donations to pious and charitable uses.’ The overseers of each monthly meeting of the people called Quakers shall be deemed so far a body corporate, as to take and hold in succession all grants and donations of personal estate made by any person dwelling within the territorial bounds of said monthly meeting, and of all real estate situate within said bounds, made or hereafter to be made to the yearly, monthly or preparative meetings of the Quakers, to said overseers, or to the use of any of said meetings, or the poor thereof; and to alien or manage the same according to the terms and conditions on which the same may have been made; and in the name of the said overseers, for the time being, to prosecute or sue for any right that may have vested in said overseers, the poor of said meetings, or in any of said meetings, in consequence of such grant or donation: Provided, that the income of the grants and donations to any one of such meetings, for the uses aforesaid, shall not exceed the sum of five thousand dollars per annum.”

 The following is a copy of this deed: “Know all men by these presents, That I, Elizabeth S. Danforth, of Dorchester, in the county of Norfolk, and state of Massachusetts, widow, in consideration of two hundred and twenty-five dollars received to full satisfaction of Jonathan Chace, Benjamin Slade, and Reuben Chace, of Swanzey, all in the county of Bristol and state aforesaid, for and in behalf of the monthly meeting of the people called Quakers, known by the name of Swanzey Monthly Meeting, have given, granted, bargained and sold, and do, by these presents, give, grant, bargain, sell, alien, and fully, freely and absolutely con *439 vey and confirm, unto them, the said George Shove, Jonathan Chace, Benjamin Slade and Reuben Chace, their heirs and assigns, to and for the uses, intents and purposes of the people called Quakers, forever, as set forth for the more effectual government thereof, in the covenanting clauses, by the said grantees, as hereafter expressed, a certain lot or piece of land, situate in Troy, in the aforesaid county of Bristol, and bounded as follows: Beginning at the southwest corner of said lot, by the highway that leads from Tiverton to Taunton, and land of Eben Slade; thence running easterly, by said Eben Slade’s land, fifteen rods; thence northerly by a line parallel with the aforesaid highway, six rods, to a stake; thence westerly, on a line parallel with the said Eben Slade's north line, fifteen rods to the highway; thence, by said highway, six rods, to the first-mentioned bounds; containing ninety square rods. To have and to hold the said granted and bargained premises, together with all their appurtenances, unto them, the said Jonathan Chace, Benjamin Slade and Reuben Chace, as feoffees, in trust for the said people, their heirs arid assigns forever. And I, the said Elizabeth S. Danforth, for myself, heirs, executors and administrators, do covenant and engage the above-demised premises to them, the said Jonathan Chace, Benjamin Slade and Reuben Chace, as well as the said people, their heirs and assigns, against the lawful claims and demands of any person or persons whatsoever forever hereafter to warrant, secure and defend by these presents. And we, the said Jonathan Chace, Benjamin Slade and Reuben Chace, do acknowledge the aforesid trust, and hereby covenant and declare, that the true intent and meaning of these presents are, that we, nor our heirs, nor either of us, nor them, shall make any claim or demand of, on or to, the granted trust and premises in our own right, or for our own use; and for the more effectual executing and full performance of said trust, that we and our heirs and each of us and them shall, at any time hereafter, upon the request and at the cost and charge of the said meeting, or such other monthly or quarterly meeting as the meeting of said people at Swanzey, for the time being, shall or may belong to, being in unity with the yearly meeting for New England, or of any person or persons they may appoint in this respect, make, do and execute such further act and deed or devise whatever, for the more effectual conveyance and assigning of the said lot of ground with its appurtenances, to and for the uses and purposes of the said people called Quakers, as by the said yearly, quarterly or monthly meeting, or their or either of their committees, may be devised, advised and required. And we, the said Jonathan Chace, Benjamin Slade and Reuben Chace, do hereby further covenant and declare, that it is the true intent and meaning of the conveyance to us as aforesaid, that we nor either of us, nor cither of our heirs succeeding us in this trust, who shall be declared by the yearly, quarterly or monthly meeting, to which he or they shall or may belong, to be out of unity or church fellowship with them, shall be capable of executing this trust or stand seized thereof, or of holding any right or interest whatever in the granted premises, whilst he or they shall so remain out of unity with the said people; but in all such cases, and also when any of us or our heirs succeeding us in this trust shall depart this life, it shall and may be the right )f the clerks of said monthly, quarterly or yearly meeting for the time being, or *440 either of them, to enter into the said trusts, in behalf and for the use of said people, and hold the same in as full and ample a manner as we shall or may after the execution of these presents. We, the said Jonathan Chace, Benjamin Slade, and Reuben Chace, for ourselves, our heirs and assigns, hereby quitclaiming, releasing and conveying to the said clerks for the time being, or either of them, in case of our being declared out of unity, or dying as aforesaid, all right, title, interest, property and demand whatsoever, in and to the aforesaid trust and granted premises, to the end that they either convey the same to such others as the meeting may appoint, or to hold the same as feoffees in trust for the people called Quakers, in unity with the yearly meeting for New England, as the said monthly, quarterly or yearly meeting may, at any time hereafter, direct and require. In witness whereof, the said Elizabeth S. Danforth, Jonathan Chace, Benjamin Slade and Reuben Chace, the covenanting parties to these presents, hereunto set their hands and affixed their seals, this day of the seventh month, in the year of our Lord one thousand eight hundred and twenty-one.
Signed, sealed and delivered ELIZABETH S. DANEORTH, [l. s.J
in presence of JONATHAN CHACE, [l. s.]
J. J. Sherburne, BENJAMIN SLADE, j>. s.]
Francis Baylibs, REUBEN CHACE, [l.s.]
David Bratton, 1 Witnesses to the signatures of Jonathan Chace,
John Mason. J Benjamin Slade and Reuben Chace."