CINTRÓN ET AL. *v.* BANCO TERRITORIAL Y AGRÍCOLA.

APPEAL from the District Court of San Juan.

No. 272.—Decided June 24, 1909.

RENDITION OF ADMINISTRATION ACCOUNTS—RECOVERY OF MORTGAGE CREDIT.—It having been proven in the case at bar that both parties litigant had agreed that the defendant should take charge of the administration and direction of an estate, for the purpose of collecting the amount of a mortgage constituted thereon, the court *Held:* That the rendition of administration accounts demanded by the plaintiffs in this case could not affect the amount of the mortgage credit which the defendant bank has sought to recover from the plaintiffs.

PUBLICATION OF NOTICES—RECOVERY OF MORTGAGE—IRREGULARITY IN THE PUBLICATION OF NOTICES.—A failure to publish the notices in due time and the publication thereof in consecutive issues of the newspaper instead of once a week, are irregularities which cannot be pleaded for the first time on appeal, but must have been previously alleged in the lower court, and established by means of evidence included in the statement of the case.

FORECLOSURE OF MORTGAGE—WRIT OF ATTACHMENT.—In this case noncompliance with section 250 of the Code of Civil Procedure was alleged as an error on appeal. *Held:* That inasmuch as the complaint did not allege the nullity of the order of foreclosure because it authorized the attachment and sale of more property than was necessary for the payment of the credit claimed, and the record does not even state in what terms it was issued, this court cannot determine whether or not said section 250 was violated.

BREACH OF MORTGAGE CONTRACT—APPRAISAL OF THE MORTGAGED PROPERTY AS AGREED UPON IN THE MORTGAGE DEED—REPEAL OF COMPULSORY PROCEEDINGS.—The special proceeding for the recovery of mortgage debts continues in force as to the first part thereof, namely, up to and including the provisions in regard to the demand for the payment of the debt, but it has been repealed as to that portion which might be known as compulsory proceedings—that is, that portion having reference to the sale of the encumbered property—which must be entirely under the Act of March 9, 1905, relating to judgments and the manner of satisfying them.

CONSTRUCTION OF SECTION 127 OF THE MORTGAGE LAW.—Section 127 of the Mortgage Law, which requires that in the mortgage shall appear the value of the estate as appraised by the contracting parties so that it may serve as basis for the judicial sale which can take place, where the period of the loan having expired it does not appear in the registry of property that said loan has been paid, cannot be construed in the sense that the appraisal of the estate by the contracting parties constitutes a fixed price, unalterable and not subject to reduction, for the sale or award.

PUBLIC SALE OF MORTGAGED PROPERTY—ESTIMATE OF SAID PROPERTY.—According to paragraph three, section 172, of the Regulations for the execution of the Mortgage Law, the estimate of the mortgaged property shall be the basis for the public sale, when said estimate exceeds the amount of the preferred

obligations, and when lower than the amount of such preferred obligations, it shall be the lowest acceptable basis of the sale. In the first case the word ''basis'' is not accompanied by the quantitative adjective ''lowest,'' as occurs in the second, which would seem to indicate that in the first case a sum lower than the estimated value may be admitted as the price at the sale, but not so in the second case.

CONSTRUCTION OF THE WORD ''BASIS'' FOR THE SALE.—According to paragraph six of section 172 of the Regulations for the execution of the Mortgage Law bids may be admitted at the sale for two-thirds of the price fixed in the notices—that is to say, of the estimated price of the property—provided such two-thirds exceed the amount of the preferred liabilities, it being therefore evident that, in such case, bids may be made for a sum lower than the estimated price, and that the word ''basis,'' employed in the law, does not signify that the appraised value of the property is a price not susceptible of reduction, in accordance with which the sale must be made.

PUBLIC SALE OF MORTGAGED PROPERTY—PREFERRED CREDITS—AWARD TO THE EXECUTION CREDITOR.—According to paragraph nine of section 172 of the Regulations for the execution of the Mortgage Law, should the second auction result in no sale or award, other auctions may be held at the instance of the claimant, for an amount not less than the preferred credits; and the award may also be requested by him in such case for the same price, with the obligation of covering such liens when they fall due, he being subrogated with respect to them, in the place of the debtor.

ID.—WHEN NO BIDS FOR MORTGAGED PROPERTY ARE MADE NOR AWARD THEREOF REQUESTED.—According to section 173 of the Regulations for the execution of the Mortgage Law, in case it should be necessary to hold the sale for a sum equal to the debts preferred to that of the plaintiff, and no sale should take place nor award requested within the 10 days following, the right of the execution creditor shall be reserved to bring an action under the ordinary declaratory suit or execution proceedings, for the recovery of his credit and the costs of the summary proceedings, against any property whatever belonging to the persons responsible.

AWARD TO THE EXECUTION CREDITOR FOR AN AMOUNT NOT LESS THAN THE PREFERRED CREDITS.—According to section 174 of the Regulations for the execution of the Mortgage Law, when the award is made to the execution creditor for an amount not less than the preferred credits, his credit is not extinguished by merging the character of creditor and debtor in one and the same person, but in such case the award would be made solely for the irreducible value of the preferred credits, thereby extinguishing the mortgage, while the credit of the execution creditor would be reduced to the category of a common debt, for the recovery whereof other property of the debtor may be proceeded against.

CONSTITUTION OF THE UNITED STATES—NOT IN FORCE IN PORTO RICO.—The appellants have invoked as ground for the appeal article one, section 10, first paragraph of the Constitution of the United States, which provides that no State shall enact any law affecting the obligations of contracts. *Held:* That the Constitution of the United States is not in force in Porto Rico, nor is this Island a State of the American Union.

ACQUIRED RIGHTS—ACT OF MARCH 9, 1905, RELATING TO JUDGMENTS AND THE MANNER OF SATISFYING THEM.—This act is not a substantive law, but an

adjective or procedure law, and as such could and should have been applied from the date provided therein to all pending proceedings and those about to be instituted.

RULES OF PROCEDURE—THEIR APPLICATION TO PENDING PROCEEDINGS.—It cannot be admitted as a general principle that the rules of procedure applicable on the date when a right originates or arises, should be applied at any time it is sought to enforce such right, irrespective of the rules of procedure which might have taken the place of the previous ones, because this might bring about as a consequence the necessity of a multiplicity of proceedings and even of courts, to decide upon the rights of the parties.

SUBSTANTIAL RIGHTS OF THE PARTIES—MORTGAGE CONTRACT.—In this case the sale of the mortgaged property for the purpose of recovering his credit is a substantial right of the mortgage creditor, and the mortgage debtors must also be recognized to have as substantial a' right that such sale be made by a public authority and in a public manner, so as to derive the greatest benefit therefrom; but whether the sale is to be made by the judge, as was formerly the case, or by the marshal, as now done, whether one or more sales are to be held, and whether certain bids are admissible or not, these are questions of procedure which do not affect the substantive law, and therefore they are subject to the changes which may be established by the legislative power for the prosecution of actions.

RENDITION OF ADMINISTRATION ACCOUNTS.—The plaintiffs being the owners of the estate which the defendant bank had in administration, the latter cannot be relieved from the obligation of rendering the accounts of its administration, nor can the plaintiffs be deprived of the right to examine the same in order to exercise such actions as they may believe to lie.

JUDGMENT—PRONOUNCEMENTS CONTRARY TO LAW.—In this case the lower court made the following pronouncement: "And in case there should be a balance in favor of the plaintiffs, after all the expenses vouched for and the credit of $12,176.96, for the recovery of which the defendant took charge of the administration of the 'Laura' estate, shall have been paid, said defendant is ordered to deliver the said balance to the plaintiffs." *Held:* That such pronouncement was contrary to law and premature.

COSTS TAXED AGAINST THE DEFENDANT—JUDICIAL DISCRETION.—The court *Held:* That the part of the judgment which taxes the costs against the defendant does not conform to sound judicial discretion, for, even on the assumption that said judgment were upheld in all its particulars, as it rejects some of the claims of the plaintiff, the costs cannot be taxed agaist the defendant bank.

The facts are stated in the opinion.

*Messrs. Hartzell and Rodríguez Serra* for appellants.

*Mr. Juan Guzmán Benítez* for respondent.

MR. CHIEF JUSTICE HERNÁNDEZ delivered the opinion of the Court.

Under date of January 12, 1906, Margarita and Eulalia Cintrón and the Estate of José Facundo Cintrón, represented

by his widow, Aurea Cuadra, and her two minor sons, José
Luis and José Cintrón y Cuadra, filed a complaint in the Dis-
trict Court of San Juan against the Banco Territorial y Agrí-
cola de Puerto Rico, and in the prayer of the complaint they
asked for the following orders:

"1. That the court order and decree that a full liquidation be
made of all the accounts between the defendant and Cintrón Her-
manos, from June 30, 1902, in accordance with the terms and stipula-
tions of the contract, by virtue of which the bank has been adminis-
tering the estate in question since said date, in accordance with the
order of the Supreme Court of Porto Rico, for the purpose of de-
termining the present and the past condition of the accounts and debts
of Cintrón Hermanos and the bank, and that to this end the bank
thereafter present to Cintrón Hermanos, or to their representatives,
monthly statements of all the operations and transactions of the bank
with the mortgaged estate, until the date of final settlement.

"2. That the defendant be ordered to exhibit to the plaintiff, or
to a referee to be appointed by the court for the purpose, all the
books, documents and accounts, showing all the operations of the ad-
ministration of the states, from June 30, 1902, in order that the plain-
tiffs may file their objections and these may be decided, as provided
in the contract, and that such objections be submitted to this honor-
able court for decision, and thus, in view of the result, the balance
of the liquidation of accounts be determined.

"3. That the restitution of the Central Laura, and appurte-
nances claimed, be adjudged and ordered, and that the public sale of
the estates which took place on May 19, 1906, be annulled and set
aside, as also all the proceedings relating to said sale, award, and
record thereof, in favor of the Banco Territorial y Agrícola de Puerto
Rico.

"4. That after the court shall have determined the true and exact
state of the accounts between the defendant and plaintiffs, the de-
fendant pay or credit the amount of the balance it may owe up to the
date of the liquidation, which may be made and approved according
to the judgment rendered.

"5. That the court grant the petitioners all the remedies to which
they may be entitled, as also the costs incurred in this action."

o

The defendant corporation answered the complaint and prayed that it be dismissed, with the costs against the plaintiffs.

The trial having been held on the day set therefor, the court rendered judgment on December 28, 1907, which was entered the same day, and reads as follows:

"*Judgment.*—Third term, December 28, 1907.    On October 28, 1907, in open court, this case was called for trial in its regular order, and both parties entered an appearance, through their counsel, and announced their readiness for trial.    Thereupon the said parties made their allegations, presented their evidence, which was heard, and made oral arguments, a term being granted them for filing briefs.

"And the court, after having heard the pleadings, the evidence and the arguments, and after having examined the briefs, is of the opinion that it should render judgment in this case, containing the following decisions:

"First. The defendant—that is to say, the Banco Territorial y Agrícola de Puerto Rico—is ordered, within a term of 15 days from the date this judgment shall become final, to render to the plaintiffs a detailed and verified account of the administration of the Estate Laura, involved in these proceedings, for the period from June 30, 1902, to May 19, 1906, the plaintiffs being ordered, within a term of 10 days counted from the date on which the accounts hereby ordered rendered are delivered to them, to state their agreement or disagreement therewith; and in the latter case, the court, in accordance with the provisions of section 205 of the Code of Civil Procedure and for the purpose of executing this judgment, will submit the question of arbitration, the arbitrator or arbitrators being then designated in the manner prescribed by law.    And in case there should be a balance in favor of the plaintiffs, after all the expenses vouched for and the credit of $12,176.96, for the recovery of which the defendant took charge of the administration of the Laura estate, shall have been paid, said defendant is ordered to deliver the said balance to the plaintiffs.

"Second. The annulment of the public sale of the Estate Laura, held on May 19, 1906, is adjudged not to lie; and,

"Third. The costs are taxed against the defendant.

"And it is ordered that execution issue for the satisfaction of this judgment, which will be entered in the proper book.

"Rendered in open court this 28th day of December, 1907. Entered this 28th day of December, 1907. (Signed) Emilio del Toro, Judge. Attest: (Signed) José E. Figueras, Secretary."

Both parties took an appeal from this judgment: The plaintiffs, in so far as it adjudges that the annulment of the public sale of the Laura Central, held in the District Court of Humacao in May, 1906, does not lie, and the balance resulting from the rendition of accounts is ordered to be delivered to them, instead of being applied to the extinction of the mortgage credit which gave rise to the public sale; and the defendant, in so far as the judgment directs the rendition of a detailed and verified account in the terms and under the declarations mentioned in the judgment.

The facts upon which the complaint is based, contradicted, corrected, or extended in the answer, as they have been proved in the trial, are embodied in a statement of facts, accepted by the parties and approved by the judge, which statement of facts we insert herewith.

### STATEMENT OF FACTS APPROVED AT THE TRIAL OF THIS ACTION.

"1. Before 1895, the firm called Cintrón Hermanos, consisting of Margarita, Eulalia, José Facundo and  Zoilo Cintrón, residing in Yabucoa, P. R., was the absolute owner of the Laura Central, with all its appurtenances and dependencies, consisting of about 1,200 *cuerdas* of land situated in the municipality of Yabucoa, a sugar factory and other buildings and improvements thereon, according to the detailed description of all this property in the Registry of Property of Humacao.

"Some time later, José Facundo Cintrón died, leaving as his heirs his wife, Aurea Cuadra, and his two minor sons, José Luis and José Cintrón y Cuadra, who constitute the heirs of said José Facundo Cintrón y Cintrón, said heirs, and the other partners of Cintrón Hermanos, being the successors to, and owners of, the property of the said firm.

"2. On April 29, 1895, Cintrón Hermanos acknowledged in a deed, executed before Mauricio Guerra, a notary, that they were indebted to the Banco Territorial y Agrícola, the defendant, in the sum of

90,000 *pesos*, in money current at that time, which debt they guaranteed by mortgage on the Laura Central, it being stipulated in the mortgage contract that the said sum of 90,000 *pesos* would be paid to the bank in installments of 4,683.09 *pesos*, during 39 semesters, and 835.59 *pesos* the last semester, making a total of 183,476.10 *pesos* in principal and interest.

"3. On May 23, 1900, Cintrón Hermanos and the Banco Territorial y Agrícola executed a deed before Notary Santiago R. Palmer, for the contract of other loans, the principal clauses of which are the following:

"First. The agricultural firm of Cintrón Hermanos acknowledges having received on this date, although prior to this act, from the Banco Territorial y Agrícola de Puerto Rico, the sum of $9,000 American gold, which they agree to pay, including mutual interest, at the rate of nine per cent per annum, within the term of one year from date; but this term shall be considered to have expired, and the bank may at once demand payment of the principal and interest, if the Laura sugar plantation and the estates annexed thereto should be sold, awarded, or leased to third persons or to the bank itself, whatever be the causes for such transfer or lease.

"Second. The said agricultural firm of Cintrón Hermanos, and in its behalf and name, its manager and administrator, Aurelio Dapena y Moreno, acknowledges having received from the Banco Territorial y Agrícola de Puerto Rico, also on this date, although prior to this act, the sum of $12,176.90 American gold, which it agrees to repay, with interest at the rate of nine per cent, reciprocally, within a term not exceeding July 15 of the current year, which is fixed as the date of maturity.

"Third. The obligation for the payment of the $9,000 American gold, contracted in the first clause, is secured by the 200 oxen, three kilometers of railway, 110 cars, carts, implements, tools and working and cultivation appliances, already transferred to the bank by prior contracts, pertaining to the Laura Sugar Central, and which now again, for the purposes of this guarantee, the firm of Cintrón Hermanos conveys to the same bank, without any reservtion whatsoever, it being understood that, until the obligations of the payment of the said principal and interest shall be fully canceled, all such property shall be considered to be specially held for the settlement thereof, and in the event of their sale or realization taking place, by common consent, the parties appraise each ox at $40, the three kilometers of railroad at $2,000, each car at $20, and they agree that the carts and implements, tools and appliances, for working and cultivation, shall be ap-

praised by two experts appointed by the parties, according to the proceedings for compulsory process in execution proceedings as provided by the Law of Civil Procedure.

"Fourth. The obligation of paying the $12,176.90, and interest thereon, contracted by Cintrón Hermanos in the second clause, they secure by the sugar-cane planted on the Laura Central and appurtenant estates, already transferred to the bank under previous agreements, and with the products elaborated or to be elaborated, rattoons, and new planting for the next crop, and the fruits and products of all kinds corresponding to the Laura Central, both in this crop as in the crop of 1901 to 1902, from its own plantings, or from its share in the plantings of growers or planters on shares; and to this end Cintrón Hermanos now convey and deliver to the Banco Territorial y Agrícola de Puerto Rico such plantings, rattoons, fruits and products, and the bank shall retain the ownership thereof until the said obligations, both as to principal and interest,· shall be fully canceled, and may exercise all the rights and adopt all the measures which, with respect to plantings, fruits and products of the Laura Central, have been recognized in its favor by the agreements contained in the deeds of August 4 and November 16, 1899, described in the statement of facts, or numbers five and six thereof.

"Fifth. The firm of Cintrón Hermanos constitutes itself the depositary of the property, plantings, fruits and products, manufactured or to be manufactured, and the effects included in all the guarantees and transfers made, binding itself to have them all at the disposition of the bank and to deliver the same to it upon demand, under the penalities and liabilities established by section 559 of the Law of Civil Procedure; and with regard to the preservation or disposition, as the case may be, of such property and effects, Cintrón Hermanos expressly submit to the rules contained in articles 39, 40 and 41 of the by-laws of the bank, with which they are perfectly well acquainted.

"Sixth. For the purpose of making the payment of the $12,176.90, American gold, constituting the obligation contracted in the second clause, and the interest thereon, the agricultural firm of Cintrón Hermanos, and in its name and behalf Aurelio Dapena y Moreno, hands over to the Banco Territorial y Agrícola the administration and direction of the Laura Sugar Central and the estates and lands appurtenant thereto, which the latter accepts, and as a consequence the bank will sell the crops and products of the estate, crediting the proceeds to the account of such indebtedness; and it will charge to said account, to the extent it may deem proper, such expenses as it may consider necessary for the maintenance of the cultivation and plant-

ings, and the manufacture thereof, for the purpose of converting them into saleable products.

"Seventh. It is agreed that the bank shall pay to De Ford & Co. the mortgage obligations which Cintrón Hermanos owe them, charging the same to the account of the administration of Laura Central, such obligations being one for 6,786 provincial *pesos,* falling due on June 26 next, and another for 3,750 provincial *pesos,* guaranteed, respectively, by 188 mortgage certificates of the second issue of the bank, and 50 mortgage certificates of the same class of its fifth issue, and upon receipt of the certificates pledged, it shall credit them to the same account, for their nominal value, against the portion due of the current coupon.

Eighth. The bank shall receive a commission of two per cent on all the products and produce sold or disposed of by the bank, in compensation for its services as administrator.

"Ninth. The parties will, by common agreement, make an inventory of the Laura estate and of the estates appurtenant thereto, including therein the property and effects given the bank as security, which they will sign and which will serve as a guide for the purposes of this contract, especially with respect to the liabilities of their depositaries, Cintrón Hermanos, and for a knowledge of the property delivered to the bank in admistration.

"Eleventh. Messrs. Cintrón Hermanos will approve or make their objections, stating the reasons therefor, to the accounts of the expenses of the administration of the estate of which the bank has taken charge, in the offices of the latter, every 30 days from this date, and if they should fail to make their objections under the terms stipulated, they agree to accept and admit the result of the accounting of the bank."

"4. In accordance with the terms of the foregoing contract, the bank entered on the administration of the Laura Central, and Cintrón Hermanos did not come until September 1, 1905, to the offices of the bank to examine the monthly accounts as agreed.

"The bank, nevertheless, on a number of occasions, forwarded copies of the accounts to Cintrón Hermanos, placing memoranda on said accounts, which were signed by Cintrón Hermanos, to the effect that said form of rendering accounts, and approving them, was understood to be without prejudice to the agreement contained in the eleventh clause of the said contract of May 23, 1900.

"The last account which appears to have been approved in this manner reaches down to June 30, 1902.

"5. On September 30, 1902, the Banco Territorial y Agrícola instituted proceedings, in the District Court of Humacao, for the execu-

tion of the mortgage constituted in April, 1895; the amount claimed under said mortgage, according to the liquidation made, was $58,103.82, American money, as principal and insurance premium, interest on said sum to September 25, 1902, and commission in advance plus additional interest at the rate of nine per cent on the principal of the mortgage and premium from September 25, 1902, to the date of payment, and the renewals of the insurance which the bank might have to pay, and expenses and costs; and in accordance with the old mortgage procedure and a reduction of 25 per cent from the sum fixed as a basis for the first sale, the second sale was held in Guayama, before the District Court of Humacao, on March 17, 1903, no bidders appearing; for which reason the bank requested and obtained the award of the property, assuming the management and administration of the estate as owner from the date of the acquisition thereof. Since said date the bank has not rendered any accounts to Cintrón Hermanos, or its representatives, regarding the administration of said property, nor were such accounts demanded of them by any person until September 1, 1905, as will be shown later.

"6. In April, 1902, the plaintiffs filed a complaint in the District Court of San Juan against the Banco Territorial y Agrícola, praying for the annulment of all the execution proceedings and award of the Laura Central had in the court of Humacao, indemnity for damages caused in the administration of the property sold, and an accounting of the profits obtained and which should have been obtained in said administration, having likewise requested a liquidation of all the credits of the bank against Cintrón Hermanos, for the purpose of determining the exact amount thereof; the complaint was based on the allegation that the bank had administered the estates improperly, that the sugar-cane grown on the lands of the central had been given to be ground to another factory (instead of having it done in that of the central), in which directors of the bank were interested, thereby causing great loss to the owners of the Laura Central; and alleging, furthermore, that in the mortgage execution proceedings serious errors had been committed which vitiated them. The proceedings having been prosecuted through all their stages and taken to the Supreme Court, the latter rendered a final judgment on June 24, 1905, holding and decreeing that the sale and award made to this bank were void, that the execution proceedings were also void from and after the second sale and should be restored to the state they had reached at the time of such sale; the other prayers of the plaintiffs were held not to lie, but without prejudice to the rights of the plaintiffs with respect to the accounts of the administrtion of the Laura Central, which were

to be rendered to them by the bank from the date of the rendition of the last accounts—that is to say, from June 30, 1902—according to the record, under the agreement contained in the public deed of May 23, 1900, because by virtue of the annulment of the sale and award the capacity of the bank, as administrator of the estate, had revived in accordance with the conditions and terms of the contract of May 23, 1900.

"7. Subsequently, on September 1, 1905, attorneys López Landrón and Hartzell and Rodríguez Serra, accompained by Notary Cruz Castro, went to the offices of the Banco Territorial y Agrícola, alleging to be the counsel and representatives of Cintrón Hermanos, and asked the bank to produce the accounts of administration, expenses and receipts of the Laura Central, justified and vouched for in the proper manner, from June 30, 1902, to August 31, 1905, and that the bank thereafter produce, at the end of every month, full accounts of such administration, with the respective vouchers and justification from August 31, 1905.

"To these demands the bank replied, among other things, that the examination of accounts being a private act in accordance with the contract of May 23, 1900, and not a matter in judicial litigation, the attorneys making the demand should prove the power which they had from Cintrón Hermanos, without which requisite the bank could not recognize their representation, and that it was ready to present said accounts to Cintrón Hermanos, or their duly authorized attorneys, for their approval or objection thereto, with the reasons therefor, from August 23, 1905, because they had been impliedly approved to that date under the eleventh clause of the contract of May 23, 1900; and that it also was ready to present such accounts from June 30, 1902, to August 31, 1905, but making it a matter of record that, in accordance with said contract, such accounts had already been approved to August 23, 1905, and that this acquiescence on the part of the bank could never be construed in the sense of a waiver of such approval thereof, or to place it in doubt. It also answered that it reserved the right to present the vouchers and evidence of such accounts or to withhold them, according to the result of the examination, at the time which might be proper, not being obliged to present such vouchers at the time of the examination.

"8. The bank, after the Supreme Court had delivered its judgment of June 24, 1905, to which reference has been made, applied to the District Court of Humacao for a new sale of the property under proceedings for the foreclosure of said mortgage, which application the court granted, directing the sale to be advertised according to the

procedure of the Mortgage Law and the Regulations for its execution. During these proceedings the plaintiffs applied to the court for a liquidation of accounts and a settlement of the debt between the plaintiffs and the defendant, alleging that said proceedings were not being prosecuted in accordance with the law in force in Porto Rico; and the court denied the application, but authorized the plaintiffs to appeal from its decision to the Supreme Court.

"The Supreme Court dismissed the appeal taken, without hearing it, on the ground that the order of the Humacao court was not appealable, and the bank, on its part, applied to the Supreme Court for a writ of *certiorari* addressed to the District Court of Humacao, by which it was sought to obtain, among other remedies, the continuation of the pending foreclosure proceedings.

"In these proceedings, on the application for a writ of *certiorari,* the Supreme Court decided to order the Humacao court to continue the execution proceedings, holding that the provisions of the Act of the Legislative Assembly of Porto Rico of March 9, 1905, relating to judgments and the manner of satisfying them, should be applied to the pending sale.

"9. After the issue of the writ of *certiorari,* an order was made on the petition of the plaintiff in said mortgage proceedings by the District Court of Humacao directing the sale of the property, and announcements of the sale were published in the newspapers, signed by the marshal of the court; the order and advertisement of the sale fixed as the amount of the debt pending payment on that date the same sum of $58,103.82, American money, as principal and insurance premium, interest on said sum to September 25, 1902, and advance commission, plus additional interest, at the rate of nine per cent accruing on the principal of the mortgage and insurance premium from September 25, 1902, to the date of payment, and the renewals of the insurance which the bank might have to pay, and the expenses and costs—that is to say, the same amount shown by the liquidation of the mortgage credit in question on September 23, 1902, which served as a basis for the sale which was subsequently set aside.

"10. At the trial counsel for the plaintiffs presented the evidence which had been produced in the previous suit brought by the said plaintiffs against the defendant in the said District Court of San Juan, which was the subject of the decision of this Supreme Court of June 24, 1905.

"This evidence consists of the testimony of the experts given at the oral trial and of their report of April 12, 1904, conceived in the following terms:

"That having examined 157 *cuerdas* of sugar-cane on the Laura Central, still to be ground, they found them in the worst possible condition of cultivation, and that they were of the worst varieties of cane known in the Island; that the 157 *cuerdas* would probably not exceed an average yield of 292 quintals per *cuerda* when ground; that no seed planting or *"gran cultura"* whatsoever had been made for the crop of 1905, and that there were only a few *cuerdas* of spring planting and some land in preparation to continue the planting for the crop of said year; that the factories, machinery and apparatus are in good condition; that there were 82 yoke of oxen in bad condition, due to lack of care and excessive work foreign to the estate; that the six kilometers of railway were in fair condition, and of the 90 cars on hand 87 were in use; that there were only eight box cars, with wooden axles, in bad condition; plows, yokes, chains, etc., and such things as are necessary to make up for this deficient agricultural material; that the loss and deterioration could be deduced from the condition of the central, which evinced a disastrous administration, nothing being noticed to show zeal, care, foresight and attention to the proper maintenance and improvement thereof; that of the 1,200 *cuerdas,* more or less, of which the estate consists, there were only 444 under cultivation, and about 60 in preparation and with new planting, and there should remain about 700 of magnificent pasture on which the 164 oxen of the estate should be kept perfectly, besides 400 or 500 additional head of cattle, which, admitted for a stipend or on shares, might give a profit of $3,600 per annum, notwithstanding which fact the oxen were in a lamentable state and there was not sufficient pasture to feed them; that taking into consideration the favorable conditions of the estate and the capacity of its machinery and apparatus, there could be obtained every year during the crop period 10,000 sacks of sugar and a net profit of $30,000, without considering the profit from the still, the rum of which has always been of a superior quality, in order to make up any difference which might be noted in the preceding estimate; that the crop of 1902 gave a net profit of $7,910.92, and in the crop of 1903 there was a loss of $6,227; that the amount of the loss suffered by the Laura estate during the administration of the bank is equal to the amount of the shortage in the profits obtained every agricultural year which has passed under such administration, and that the cause of the loss was none other but the bad administration of the bank.

"11. The mortgage contract entered into on April 29, 1895, by virtue of which the execution proceedings hereinbefore mentioned were prosecuted, contained a clause by which the contracting parties,

for the purposes of article 127 of the Mortgage Law, valued the mortgaged property at the sum of 134,506 *pesos,* which sum was to serve as a basis for the public sale to be had under execution proceedings in default of payment, any new appraisal or action tending thereto being waived.

"12. The said Laura Central was sold at public auction by the marshal of the Humacao court on May 19, 1906, under the said mortgage proceedings, and the property was awarded to the bank as the highest bidder for the sum of $47,000, the deed of sale being executed the same day before Notary Juan de Guzmán Benítez.

"13. On August 28, 1906, the said estate, together with other property, was sold by the bank to Manuel Méndez Dueño, for the sum of $110,000.

"14. In the same contract of May 23, 1900, executed before Notary Palmer, some of the clauses whereof are inserted in the third paragraph of this statement, there appear other clauses which read as follows:

"Tenth. For the purposes which may be proper in due time, Cintrón Hermanos state that it does not suit them to take advantage of the provisions in force relating to the suspension of the collection of the principal of mortgage loans on rural property, and consequently they formally and solemnly waive the rights which may be derived from said provisions, or any others of a similar character, which may be enacted, whatever their origin; so that if the creditor bank should apply for the administration of the Laura Central, and of the estates appurtenant thereto, for the purpose of recovering the first mortgage the entire amount of which is due and payable, owing to default in the payment of the ninth and tenth installments thereof which are past due, it may assume charge of the administration of the said estate, for the purpose of collecting not only the interest accrued and accruing, but also the entire principal remaining unpaid, expenses and costs.

"Twelfth. The debtors, Cintrón Hermanos, may at any time pay the sums they now owe the bank and such as they may hereafter owe them as a consequence of this contract, with interest, costs, and expenses to the date of payment, and this done, they may freely dispose of the property and effects liable for the sum paid, provided that thereby the obligation secured shall be totally canceled.

"San Juan, P. R., March 26, 1908."

"The attorneys for the parties present this statement of facts, to which they agree, and pray the court to approve it for the purposes of the appeal taken by both parties in this cause.   Hartzell and Rodrí-

guez Serra, Counsel for Plaintiffs.   Juan Guzmán Benítez, Counsel for Defendant.    March 27, 1908.·    Approved: Emilio del Toro, Judge."

The plaintiffs allege the following as legal grounds of the appeal taken by them:

"1. The sale by auction of the Laura Central without the Banco Territorial y Agrícola's having first rendered the accounts of the administration thereof so that, in view of the result thereof, the writ of execution might determine the amount actually due, as provided by section 240 of the Code of Civil Procedure, which accords with the provisions of article 169 of the Regulations for the execution of the Mortgage Law.

"2. Failure to publish the notices in due time, to permit the period of 20 days to elapse between such notice and the sale.

"3. Publication of the notices, in three consecutive numbers of the Boletín Mercantil, when section 251 of the Code of Civil Procedure requires that the publication be made once a week.

"4. Failure to comply with the provisions of section 250 of said Code, in so far as it provides that the marshal shall levy only on property sufficient to cover the sum determined in the writ of execution, and the amount of the costs.

"5. Violation of the mortgage contract, in the sale by auction of the Laura Central, and of the provisions of the Mortgage Law and the regulation for its execution cited as pertinent to the case, inasmuch as while article 127 of said law provides that the mortgage deed shall determine the price at which the contracting parties value the mortgaged estate, in order that it may serve as a basis for any sale which might be held, said valuation having been fixed at the sum of $134,506.09, by public deed of April 29, 1895, the Laura Central was awarded to the bank, with all its appurtenances, for the price of $47,000, to the prejudice of the plaintiffs and in violation to the Constitution of the United States, which protects the private interests of the inhabitants of Porto Rico."

With regard to the first ground of the appeal the plaintiffs allege in their complaint that, on May 23, 1900, they agreed with the bank that it would assume the administration and management of the Laura Central and its appurtenances, for the purpose of working it and thus obtain the payment of the

$12,176.90, which indebtedness they acknowledged, and of *any other sums which might be due on account of the mortgage constituted in favor of the bank in the year 1895.*

The bank, in its answer, absolutely denies that it had been stipulated that the administration of the estate should have anything to do with the collection of the mortgage constituted in its favor in the year 1895.

In view of the defendant's denial of the allegation of the plaintiff, it devolved upon the latter to prove such allegation, according to section 108 of the Act of March 9, 1905, to regulate the introduction of evidence in civil proceedings; but, instead of submitting such evidence, it appears, on the contrary, from the sixth clause of the public deed of May 23, 1900, inserted in the statement of facts, that the bank received from Cintrón Hermanos the administration and direction of the Laura Central, and the lands appurtenant thereto, to effect the payment of the $12,176.90 of the obligation contracted in the second clause of said deed, with interest.

Under these circumstances, the accounts of the administration by the bank of the Laura Central have not the slightest bearing upon the amount of the mortgage credit which the bank has sought to recover from Cintrón Hermanos, the demand therefor resulting in the sale which it is sought to annul; and, therefore, whatever might be the result of the administration accounts, the amount of the mortgage credit and the interest thereon can suffer no change whatsoever.

With regard to the second and third grounds of the appeal, they constitute new matter of allegation in this Supreme Court which we cannot now discuss and decide, because the complaint does not say anything with relation to the irregular publication of the notices of the sale of the Laura Central, nor do we find in the statement of facts any evidence whatsoever on this particular.

With respect to the fourth ground, as it refers to the proceedings for the foreclosure of a mortgage, it is to be assumed that in compliance with the first section of the act relating to

judgments and the manner of satisfying them, approved March 9, 1905, an order for the sale of the mortgaged estates was issued to the marshal, and he had to conform to such order. Nor does the complaint allege the nullity of such order, because it authorized the attachment and sale of more property than necessary for the payment of the credit claimed; and, furthermore, the record does not even state in what terms it was issued, which is an indispensable requisite to permit us to determine whether or not it was violated in its execution.

Let us now examine the last ground of the appeal.

In the first place we must state that this Supreme Court, in deciding on April 9, 1906, the application for a writ of *certiorari* referred to in the statement of facts approved by the inferior judge, which application was made by the Banco Territorial y Agrícola against J. A. Erwin, Judge of the District Court of Humacao, in the summary proceedings which originated this action, the court, among other things, said:

"The writ of *certiorari* applied for having issued and the record of the proceedings prosecuted by the Banco Territorial y Agrícola against Cintrón Hermanos for the recovery of a mortgage credit having been received in this Supreme Court, the hearing on the appeal was had, counsel for the bank, as also for Cintrón Hermanos, having subsequently filed briefs, the former maintaining the force of the summary proceedings established by the Mortgage Law and the Regulations for its execution for the recovery of mortgage debts, although amended by the Act of March 9, 1905, which is that which, he alleges, should regulate the sale ordered, while counsel for Cintrón Hermanos argued that said proceeding had been repealed by the Code of Civil Procedure in force and the said Act of March 9, 1905. We must now discuss and decide whether the procedure followed by the District Court of Humacao, since this Supreme Court delivered its opinion of June 24 of last year, does or does not conform to the provisions of law, because this is the subject matter of this application for a writ of *certiorari*. The Act of March 9, 1905, relating to judgments and the manner of satisfying them, which went into effect 30 days after its approval, and which, therefore, was in force when the court of Humacao ordered, in the terms stated, the second sale of the mortgaged property, establishes in a clear manner the procedure to be followed

in the sale, which procedure has repealed that provided by the Regulations for the execution of the Mortgage Law; and the District Court of Humacao, in ordering that the second sale should be held in the manner and form provided by said Regulations, has not proceeded in accordance with said act. In corroboration of the foregoing we reproduce what this court has already said through Mr. Justice Figueras in delivering its opinion in the case of Emilia Jiménez and Felicia Garriga y Brenes against Julio Brenes Aponte, for the recovery of a mortgage credit, decided on appeal on February 8, 1906:·

" 'The special proceeding for the recovery of mortgage debts continues in force as to the first part thereof, namely, up to and including the provisions in regard to the demand for the payment of the debt, but it has been repealed as to that portion which might be known as compulsory proceedings—that is, that portion having reference to the sale of the encumbered property, which must come entirely under the Act of March 9, 1905, relating to judgments and the manner of satisfying them.' "

As will be observed, it is already a matter decided with the authority of *res judicata,* that the sale whose annulment is sought in the complaint, should have been held, as it was held, in the manner and form prescribed by the Act of March 9, 1905, relating to judgments and the manner of satisfying them, thus complying with the orders of this Supreme Court in its aforementioned decision. The same counsel for Cintrón Hermanos then maintained that the mortgage proceeding had been repealed by the Code of Civil Procedure and the Act of March 9, 1905. He does not now agree with his earlier opinion, and maintains that the Act of March 9, 1905, could not have been applied to the sale, because it violated the law of contract in so far as it permits the adjudication of the property sold for a price lower than that agreed on by both parties in the deed of April 29, 1895, when the mortgage was constituted.

But there is no such violation.

It is true that Cintrón Hermanos and the Banco Territorial y Agrícola, in accordance with the provisions of article 127 of the Mortgage Law, appraised the mortgaged estate at the

sum of $134,506 provincial *pesos,* and that this estate was awarded to the bank for a lower sum, namely, $47,000.

In order to define the scope of said article we transcribe it here:

"Article 127.—In the mortgage shall appear the value of the estate as appraised by the contracting parties, which shall serve as a basis for the only judicial sale which can take place, if the period of the loan having expired, it does not appear in the registry of property that said loan has been paid."

Can this article be construed, as claimed by Cintrón Hermanos, in the sense that the appraisal of the estate by the contracting parties constitutes a fixed price, unalterable and not subject to reduction, for the sale or award? By no means.

Subdivision three of article 128 of the said law provides that the sale shall be held 20 days after the publication of the notices, and if there is no bidder, the execution creditor may demand that the property be awarded to him, he being responsible for all prior liens, if there be any.

This article says nothing as to the price for which the award should be made, although it imposes upon the person to whom it is made the obligation of assuming responsibility for all prior liens.

Article 172 of the Regulations for the execution of the Mortgage Law provides in its third paragraph:

"When the estimate of the property agreed to in the instrument constituting the loan, by virtue of which the proceedings are held, exceeds the amount of the preferred obligations secured by the property, said estimate shall be inserted in the notices as a basis for bids at the public sale."

So that the estimated value of the mortgaged property shall be the basis of the sale when it is higher than the amount of the preferred obligations, and when lower than the amount of such preferred obligations, it shall be the lowest acceptable basis of the sale. In the first case the word "basis" is not ac-

companied by the quantitative adjective "lowest," as occurs in the second, which would seem to indicate that in the first case a sum lower than the estimated value of the property may be admitted as the price at the sale, but not so in the second case.

This interpretation is supported by the provisions of the sixth paragraph of said article 172, which provides that the sale may be made in the form prescribed for execution proceedings, with the reservation that when two-thirds of the figure fixed in the notices does not exceed the amount of the preferred obligations, this amount shall be the minimum admissible for the bids. If at the sale bids may be admitted for two-thirds of the price fixed in the notices—that is to say, of the estimated price of the property—provided such two-thirds exceed the amount of the preferred liabilities, it is evident that, in such case, bids may be made for a sum lower than the estimated price, and that the word "basis," employed in the law, does not signify that the appraised value of the property is the price not subject to reduction in accordance with which the sale should be made, as alleged by the firm of Cintrón Hermanos.

In corroboration of the doctrine stated, we have the seventh paragraph of said article 172, according to which the execution creditor may request that the property be awarded to him for the lowest figure which could have been admitted from a bidder, according to the preceding paragraph, assuming all prior liens and being obliged to deposit any surplus there may be, after his credit has been covered.

In accordance with this paragraph, the execution creditor may request that the property be awarded to him for the same value or price at which a bidder could have acquired such property, provided this price covers the amount of the preferred liabilities.

According to the eighth paragraph, should the execution creditor not demand the award, he may request that the mortgaged property be again offered at public sale, with a reduction of 25 per cent from the sum fixed in the first sale, pro-

vided such reduction covers the prior credits, which sale shall be held in the same manner as the first sale—that is to say, in the manner prescribed for execution proceedings—bids being admissible which cover two-thirds of the reduced price, provided they cover the credits preferred to that of the creditor, who may also request the award of such property under the conditions established for a bidder, should the second sale prove wholly or partially unsuccessful.

Therefore, the appraised value of the mortgaged property is not unalterable, nor incapable of reduction, when such appraised value may be reduced by 25 per cent and bids may be admitted and the award in a proper case made for two-thirds of the reduced price, provided the preferred obligations are covered.

Following the same doctrine, the ninth paragraph of the said article provides that, if the second auction should not result in a sale or award, other auctions may be held at the instance of the claimant, who shall, in a proper case, comply with the requisite mentioned in the preceding paragraph, for an amount not less than the preferred credits; and the award may also be requested by him in such case for the same price, with the obligation of covering such liens when they fall due, he being subrogated with respect to them, in the place of the debtor.

Thus, for example, if the thing mortgaged has been appraised in the mortgage deed at the sum of $20,000, and the preferred credits amount only to $10,000, the execution mortgage creditor may, when the second auction has resulted from no sale or award, apply for a third sale for an amount not less than $10,000, or request the award of the property for such price of $10,000, without any further obligation than that of covering or paying such credits when they fall due, he being subrogated, with respect to them, in the place of the debtor.

Article 173 orders that in case it should become necessary to hold the sale for a sum equal to the debts preferred to that of the plaintiff, and no sale should take place, nor the award

requested within the 10 days following, the right of the execution creditor shall be reserved to bring an action under the ordinary declaratory suit or execution proceedings, for the recovery of his credit and the costs of the summary proceedings, against any property whatsoever belonging to the persons responsible.

We do not find in any part of the Mortgage Law and the Regulations for its execution the privilege alleged by Cintrón Hermanos as granted, namely, that the appraised price agreed on by the parties should be the minimum amount for the sale or award.

This minimum price of sale is, in a proper case, the value of the preferred liabilities; and the reason therefor is that until the preferred creditors shall have had their respective credits covered, the execution creditor cannot recover his.

Nor can it be alleged that when the award is made to the execution creditor for an amount not less than the preferred credits, his credit is extinguished upon the merging in one and the same person of the character of creditor and debtor, because in such case the award would not be made solely for the irreducible value of the preferred credits, but also for the value of his credit, which is contrary to the idea of the legislator.

What does occur is that the mortgage—that is to say, the guarantee—is extinguished and the credit is reduced to the category of a common credit, and for the recovery thereof other property of the debtor may be proceeded against.

This is specifically provided by the second paragraph of article 174, which reads as follows:

"After the estate has been sold or awarded, and the price has been applied in the proper manner, the proper cancellations shall be made, in accordance with the provisions of the Mortgage Law and those of the Law of Civil Procedure. This shall be construed without prejudice to the other rights and actions which the remaining creditors, or those which have not been wholly satisfied, may exercise against the debtor."

If any doubt could still remain that the appraised price of the mortgaged property is not the minimum price of the sale or award to the execution creditor, in cases like that under consideration, in which the execution creditor is the first and not the second or subsequent mortgage creditor, the second paragraph of article 176 of the Regulations gives us the best means of deciding this doubt.    It reads as follows:

"The provisions of the Law of Civil Procedure in force in Cuba, Porto Rico, and the Philippines, shall be applicable to these proceedings as supplementary, when not in conflict with the provisions contained in the Mortgage Law and these Regulations."

Let us, therefore, recur to the Law of Civil Procedure, in which we find the following articles to be relevant to this matter:

"Article 1497.—At the sale of personal and real property no bids shall be accepted which do not amount to at least two-thirds of the appraised value.    Bids may be offered and received on behalf of a third person.

"Article 1499.—The execution creditor may bid at the sale and increase the bids without his being required to make the deposit mentioned in the foregoing article.

"Article 1502.—Should there be no bidder, the execution creditor shall have the option of requesting that the property be awarded to him for two-thirds its appraised value, or that it be again offered at public auction, based upon a reduction of 25 per cent of the appraised value.

"The second sale shall be announced and held in the same manner as the first one.

"Article 1504.—If the execution creditor does not agree to either of the two measures mentioned in the foregoing article he may request that a third auction be held without fixing the minimum bid to be accepted.

"In such case, if there should be a bidder offering two-thirds of the price which served as a basis for the second auction, and who accepts the conditions of the sale, the said sale shall be approved.

"If a bid of less than said two-thirds should be offered, the approval of the sale shall be held in abeyance, and the debtor shall be

informed of the price offered, who, within the next nine days, may pay the creditor and have his property released, or may procure some person to increase the bid, making the deposit prescribed in article 1498.

"After the nine days have elapsed without the debtor either having paid or increased the bid, the sale shall be approved and ordered consummated."

As will be observed, the valuation of the property sold at auction in accordance with the former Law of Civil Procedure, was not the only fixed, unalterable, irreducible and minimum price which could be accepted for the sale or award of such property, but it was the norma or guide which was to serve as a basis to determine the admissible price in sale or award.

The legislator desired that the price at which the contracting parties appraised the estate should be stated in the mortgage deed, not to give greater value to the appraisal of the parties than to that fixed by the experts according to the former Law of Civil Procedure, but to facilitate the recovery of the mortgage credits by fixing the agreed price which was to govern the sale, thus doing away with the preliminary appraisal by experts.

We find this purpose set forth in the statement of motives which precedes the draft of the Law of May 26, 1893, for the amendment of the Mortgage Law then in force.

So true is this that the Regulations for the Execution of the Mortgage Law provide in the last paragraph but one of article 175, that creditors who have their rights recorded prior to the amended law may choose the summary proceeding, providing to this end that, when titles of their credits do not state the agreement of the debtor as to a fixed price for the sale, such agreement had to be proved by means of a public document, or an appraisal demanded in accordance with the Law of Civil Procedure, to prepare the notice of the public sale. The legislator thus recognized in an express manner that the price agreed on between the parties and that fixed under provision of law by the appraisal of experts, had the same legal effects.

Having examined the provisions governing the sale and

award of mortgaged property under the summary proceedings established by the Mortgage Law and the Regulations for its execution, let us now ascertain at what price the Laura estate after a second auction without success, for the first auction had already been held, could have been awarded to the bank.

The Laura Central was appraised by the parties at 124,506 provincial *pesos,* equivalent to $80,703.60; and inasmuch as for the second sale 25 per cent had to be deducted from said appraisal, thus reducing the value to $60,525.70, it is evident that the award to the bank can be made for two-thirds of this reduced price—that is to say, for the sum of $40,351.80.

- At the sale, the annulment of which is sought and which was held in accordance with the provisions of the Act of March 9, 1905, the Laura Central was awarded to the Banco Territorial y Agrícola for the sum of $47,000—that is to say, for a price exceeding that for which it could have been awarded to it, if the earlier procedure repealed by said act had been followed.

Therefore, Cintrón Hermanos have really suffered no loss by the application of the Act of March 9, 1905. The allegation of loss is based on the assumption that the agreed value of the Laura Central had to be the fixed, unalterable, and irreducible price of the sale or award, according to the Mortgage Law and Regulations, and we believe that we have shown that such assumption is evidently erroneous.

For the same reason the violation of the law of contract is imaginary.

- It is true that the Constitution of the United States provides in article one, section 10, first paragraph, that no State shall enact any law affecting the obligations of contracts; but said Constitution is not in force in Porto Rico, nor is this Island a State of the American Union.

However, as section three of the Civil Code of Porto Rico would seem to admit the principle sanctioned by the Constitution of the United States, that a law cannot prejudice ac-

quired rights, it is advisable to examine whether the Act of March 9, 1905, has violated that principle.

Section three of our Civil Code provides as follows:

"Laws shall not have a retroactive effect unless they expressly so decree.

"In no case shall the retroactive effect of a law operate to the prejudice of rights acquired under previous legislative action."

The said Act of March 9, 1905, is not a substantive law, but an adjective or procedure law, and as such could and should have been applied from the date provided therein to all pending proceedings or those about to be instituted.

We cannot admit as a general principle, from any point of view, that the rules of procedure applicable on the date when a right originates or arises, should be applied at any time it is sought to enforce such right, irrespective of the rules of procedure which might have taken the place of the previous ones, because this might bring about as a consequence the necessity of a multiplicity of proceedings, and even of courts, to decide upon the rights of the parties.

José María Manresa y Navarro, in his work *Comentarios al Código Civil Español*, volume one, page 55, commenting on article three of said Code, of which section three of our Code is an exact reproduction as to its first paragraph, the second paragraph having been added, says:

"With regard to the laws of procedure, the legislator generally permits the option between the previous law and the amended law during a reasonable period, to persons who are subject to proceedings when the last law is promulgated and the former law is radically changed. Otherwise he at once imposes the new provisions, because as he believes them to be nearer perfection and to better protect the rights of all that any one has acquired, he does not consider a right not to be protected. The nonretrospective principle should be employed only when it really prejudices an acquired right, which would occur, for example, if a means of proof were abolished which was the only means a party could use and the latter had established it before-

hand, conforming to the law in force at the time the act in question took place.''

Mucius Scevola, in volume one of his work *Código Civil,* page 116, commenting on the same article, says:

''This principle indicates what is already known, namely, that, in the sphere of civil law, is where the greatest importance attaches to the question, because it is there that the social interest is less ostensible or apparent, and, on the contrary, acquired rights manifest themselves with greater frequency. Therefore, in the political laws and in the laws of procedure, the conflict is not present, or it is not so easy that it should present itself with respect to the former, because, as Pardessus very aptly says, such laws are all retroactive, because they modify the institutions under which men were born and live; and with relation to the latter, because they affect the right of the State, not that of the individual. Therefore, as Laurent very well says, referring to the execution of a contract by judicial proceedings, the parties are not those who execute, it is the public power which gives them its support to obtain it (the execution), in a compulsory manner. In this case the parties have no right to oppose the legislator when he modifies the mode of execution of contracts. At the utmost, they may invoke an interest; but private interest gives way to that of the State.''

Bouvier, in his Law Dictionary, says:

''An act may regulate or limit existing remedies on a contract, provided it leaves a substantial remedy in force; for instance, it may reduce the period of limitation for bringing suits if it leaves a reasonable period for suits for breaches of existing contracts (104 U. S., 660); it may require the recording of existing mortgages, if it allow a reasonable time before the act takes effect (108 U. S., 514).

''There is a broad distinction taken as to the obligation of a contract and the remedy upon it. The abolition of all remedies by a law operating *in praesenti* is, of course, an impairing of the obligation of the contract. But it is admitted that the legislature may vary the nature and extent of remedies, as well as the times and modes in which these remedies may be pursued, and bar suits not brought within such times as may be prescribed. A reasonable time within which rights are to be enforced must be given by laws which bar certain suits; 3

Pet., 290; 1 How, 311; 2 Gall., 141; 8 Mass., 430; 1 Blackf., 36; 14 Me., 344; 7 Ga., 163; 21 Miss., 395; 1 Hill, S. C., 328; 7 B. Monr., 162; 9 Barb., 489."

In *Antonio* v. *Greenhow,* 107 U. S., 769; 27 L. Ed., 468, the Supreme Court of the United States expresses itself in the following terms: "As was properly said by Mr. Justice Swayne in *Von Hoffman* v. *City of Quincy, ubi supra,* 'It is competent for the States to change the form of the remedy, or to modify it otherwise, as they may see fit, provided no substantial right secured by the contract is thereby impaired. No attempt has been made to fix definitely the line between alterations of the remedy, which are to be deemed legitimate, and those which, under the form of modifying the remedy, impair substantial rights. Every case must be determined upon its own circumstances. Whenever the result last mentioned is produced the act is within the prohibition of the Constitution, and to that extent void,' page 553. In all such cases the question becomes, therefore, one of reasonableness, and of that the legislature is primarily the judge. (*Jackson* v. *Lamphire,* 3 Pet., 280; *Terry* v. *Anderson, ubi supra.*) We ought never to overrule the decision of the legislative department of the government, unless a palpable error has been committed."

In this case the sale of the mortgaged property for the purpose of recovering its credit is a substantial right of the Banco Territorial y Agrícola derived from the nature of a mortgage contract, and Cintrón Hermanos must also be recognized to have as a substantial right, that such sale be made by a public authority and in a public manner so as to derive the greatest benefit therefrom; but whether the sale is to be made by the judge, as was formerly the case, or by the marshal, as is now done, whether one or more sales are to be held, and whether certain bids are admissible or not, these are questions of procedure which do not effect the substantive law, and therefore they are subject to the changes which may be established by the legislative power for the exercise of actions.

For the reasons stated, we believe the judgment rendered by the District Court of San Juan to conform to the facts and the law in the part appealed from by Cintrón Hermanos, and we will now consider it in relation with the appeal taken by the Banco Territorial y Agrícola.

Counsel for the Banco Territorial y Agrícola prays this Supreme Court in his brief to reverse the judgment of the lower court in the first and third particulars thereof, and that it be relieved from any obligation of rendering any accounts of the administration of the Laura Central, and appurtenant estates, which it assumed under the public deed of May 23, 1900, and that no special taxation of costs be made.

We consider the first pronouncement of said judgment to conform to the law and to justice, *in so far as it orders the Banco Territorial y Agrícola de Puerto Rico to render to the plaintiffs, within a term of 15 days from the date it shall become final,* a detailed and verified account of the administration of the Laura estate, during the period between June 30, 1902, and May 19, 1906. The plaintiffs being the owners of the Laura estate and the Banco Territorial y Agrícola the administrator thereof, the latter cannot be relieved from the obligation of rendering the accounts which it did not render, whatever be the stipulations agreed on by the parties in the deed of May 23, 1900. If such an exemption were admitted, one of the parties could, to the prejudice of the other, violate with impunity the conditions of the contract of agency which every administration entails, while the aggrieved party would be unable to exercise any right whatsoever, including that of enforcing the liability arising from fraud, which is enforceable in all obligations, a waiver of the action to enforce it being void according to section 1069 of the Civil Code. The plaintiff and the defendant are parties equally interested in the account of the administration of the Laura estate, and the latter cannot be deprived of the right to examine them so as to prepare such actions as said party may believe to lie, which actions may or may not be successful, after the allegations of

the parties and the evidence presented in support of their respective claims, have been heard.

The Banco Territorial y Agrícola itself, upon being requested on September 1, 1905, by Attorneys López Landrón, and Hartzell and Rodríguez Serra, on behalf of Cintrón Hermanos, to produce the accounts of the administration of the Laura Central, *stated that it was ready to present to Cintrón Hermanos or to their duly authorized attorneys, the accounts which they requested, for their approval or objection, with the reason therefor, since August 23, 1905, because up to said date they had been impliedly approved according to the eleventh clause of the contract of May 23, 1900; and that it was also willing to present said accounts from June 30, 1902, to August 31, 1905, but making it a matter of record that, in accordance with said contract, these accounts had already been approved to August 23, 1905, and that the acquiescence of the bank could not be construed in the sense of renouncing or placing in doubt the fact of their having been acknowledged.*

These statements clearly reveal that the bank was willing to show Cintrón Hermanos the accounts relating to the administration of the Laura Central, and only denied the latter's right to object to its accounts of the administration, holding that they had been accepted and approved impliedly according to the terms of the deed of May 23, 1900.

Such allegation appears to us to be premature, because it could only be made after Cintrón Hermanos, in view of the accounts had in due form, made the objections which they might consider advisable.

An examination of the accounts by Cintrón Hermanos is necessary for the prosecution of such actions as they may believe themselves entitled to, and all the doors for any claims cannot be closed to them, by keeping from their inspection accounts in which they are parties as interested as the Banco Territorial y Agrícola.

With regard to the other particulars of the first pronouncement of the judgment appealed from, they do not appear to us

to be in accordance with the law. Upon an examination of the accounts of the administration of the Laura estate by the plaintiffs, the latter may exercise any rights they may have, and the moment will have then arrived to make the decisions which the law advises after the necessary legal proceedings. It is premature to invoke as applicable to the case section 205 of the Code of Civil Procedure, and order that an uncertain balance be delivered by the plaintiffs to the defendants.

The part of the judgment which taxes the costs against the defendant does not conform to sound judicial discretion, because, even on the assumption that said judgment was upheld in all its particulars, as it rejects some of the claims of the plaintiff, the costs cannot be taxed against the defendant bank.

In view of the foregoing reasons, we are of the opinion that the judgment appealed from should be affirmed, in so far as it holds that the annulment of the sale had on May 19, 1906, does not lie, and orders the Banco Territorial y Agrícola de Puerto Rico to render to the plaintiffs, within a period of 15 days, a detailed and verified account of the administration of the Laura estate during the period between June 30, 1902, and May 19, 1906, which term of 15 days may be extended in the discretion of the lower court, and that said judgment should be reversed as to the other particulars contained therein, without any special taxation of the costs of both instances.

*Decided accordingly.*

Justices Figueras, MacLeary and Wolf concurred.
Mr. Justice del Toro did not sit at the hearing of this case.